# Illinois Official Reports

## Appellate Court

<div style="border:2px solid black; padding:10px;">

### *People v. Sangster*, 2014 IL App (1st) 113457

</div>

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTOINE SANGSTER, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-11-3457 |
| Filed<br>Rehearing denied | March 31, 2014<br>April 28, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for first degree murder and attempted first degree murder in a gang-related shooting were upheld where defendant's recorded telephone conversation from jail involving witness tampering was properly admitted in evidence based on the silent witness theory, there was no error in the admission of two witnesses' prior inconsistent statements as substantive evidence and for impeachment, identification testimony was properly admitted for impeachment, the jury was fairly instructed by the trial court's *sua sponte* amendment of an instruction that applied to the theories raised by the parties, and the prosecutor's closing arguments did not violate any of the trial court's rulings or reference excluded evidence. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-22734 (02); the Hon. Timothy Joseph Joyce, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Ginger Leigh Odom, all of
State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg,
Joan F. Frazier, and Joseph Alexander, Assistant State's Attorneys, of
counsel), for the People.

Panel

PRESIDING JUSTICE HYMAN delivered the judgment of the court,
with opinion.
Justices Neville and Mason concurred in the judgment and opinion.

## OPINION

¶ 1    A jury convicted defendant Antoine Sangster of first degree murder for the shooting death
of Frank Meeks and attempted first degree murder for the shooting of Christopher Davis. He
received consecutive 40- and 21-year prison sentences.

¶ 2    Sangster raises a number of challenges for our consideration. He contends the trial court
erred by admitting an audio recording of a telephone call placed from the Cook County jail and
attributed to defendant relating to an attempt at witness tampering. Sangster further contends
the trial court should not have admitted evidence that Christopher Davis identified defendant
as the shooter while speaking with Robbie Horton and allowed the State to introduce numerous
inadmissible hearsay statements through Robbie Horton's grand jury testimony and
Psallareous Baskin's signed statement. Next, Sangster contends the court improperly
introduced a new theory of guilt, which defendant had no opportunity to defend against, by
*sua sponte* amending the jury instruction on the elements of first degree murder to include
transferred intent after the parties concluded their closing arguments. Lastly, defendant
challenges the propriety of the State's closing argument, claiming the prosecutor improperly
commented on excluded evidence and made arguments not based on the evidence.

¶ 3    We affirm. We find no abuse of discretion in the trial court's decision to admit defendant's
recorded jail telephone conversation, finding a proper foundation for the call was laid under the
silent witness theory. We find no reversible error in the trial court's admission of Robbie
Horton's and Psallareous Baskin's prior inconsistent statements as substantive evidence and
for impeachment purposes. Additionally, Christopher Davis's identification of defendant as
the shooter was properly admitted for impeachment purposes and to show the effect on Horton
and his course of conduct. We also find nothing improper in the trial court's decision to amend
the jury instruction. Doing so fairly instructed the jury of the law applicable to the theories
raised by the State and defense. In addition, the amendment accurately reflected the applicable
law and evidence at trial. Bearing in mind that the law grants a prosecutor wide latitude during
closing and rebuttal arguments, we find that the prosecutor's complained-of remarks did not

deprive Sangster of his right to a fair trial. The prosecutor did not violate the trial court's ruling and did not reference excluded evidence; further, we find the prosecutor's comments regarding the truthfulness of gang members to be based on the evidence.

¶ 4                                    BACKGROUND

¶ 5        Shooting victim Christopher Davis testified at trial under subpoena. Davis said that on June 1, 2006, he and Frank Meeks were standing on Springfield Avenue when shots hit both of them. Meeks died of his wounds. Davis also acknowledged the presence at the scene of LaVonte Davis. (To avoid confusion, Christopher Davis will be referred to as "Davis" and LaVonte Davis as "LaVonte.") But Davis testified to little else. He denied ever belonging to the Four Corner Hustlers street gang, holding a rank within the gang, or going by the street name "C-Gutta." Davis also denied telling Robbie Horton that he had enough time to turn around and see defendant Antoine Sangster, also known as Bozo, shooting at him.

¶ 6        Before Robbie Horton testified, Sangster's counsel objected to the State's use of Horton's handwritten statement and grand jury testimony.

¶ 7        In the handwritten statement, which disclaimed any promises or threats to entice its preparation, Horton identified the shooter as Sangster and acknowledged that Sangster and Davis were feuding over drug territory.

¶ 8        In his grand jury testimony, Horton testified that he held the rank of five-star universal chief with the Four Corner Hustlers street gang. Again, he acknowledged a conflict over drug territory and that Sangster was "going after" Davis. Horton told the grand jury that following Davis's release from the hospital after recovering from the shooting, Horton spoke with Davis, and Davis said he "had enough time to turn around and look to see who was coming and which way they was coming from, and he recognized [defendant]" was shooting at him. Horton further testified that he had a conversation with Sangster and asked Sangster about the shooting. Horton testified Sangster responded "yeah, but that wasn't for [Meeks]." Horton asked what Sangster meant. Sangster said he was "trying to get [Davis]," adding Davis was "lucky again."

¶ 9        Sangster's counsel informed the court that Horton told him that he would contradict both his handwritten statement and grand jury testimony, disputing both that Davis told Horton the shooter was Sangster and that Sangster told Horton he fired the shots. Counsel argued the State should not be allowed to impeach Horton with either his handwritten statement or grand jury testimony because "he would not be doing any affirmative damage to the State's case by merely denying that he had conversations with either [defendant] or Chris Davis." Counsel further argued Horton had no personal knowledge of the shooting and that the State could not use the evidence to "prove that [defendant] shot Chris Davis or Frank Meeks."

¶ 10       The State argued for use of Horton's statements to impeach Davis and agreed not to argue that the statements constituted substantive evidence. Concerning Horton's conversation with Sangster, the State argued it came in substantively under section 115-10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2010)).

¶ 11       The court, after noting that Horton's handwritten statement might be inadmissible under section 115-10.1(c) because of the "potentially problematic hearsay," admitted the grand jury testimony substantively because, as it was given under oath, the personal knowledge

requirement did not apply. The court agreed to limit the use of Horton's handwritten statement with an instruction.

¶ 12 Robbie Horton testified he, Davis, and Meeks were members of the Four Corner Hustlers street gang in 2006, but disavowed attaining any rank within the gang. Horton said his street name was "Wally," Davis's was "C-Gutta," Meeks's was "Spook," and Sangster's was "Bozo." Horton claimed ignorance of any dispute between Davis and Sangster and further claimed Sangster never admitted to him that he was the shooter.

¶ 13 The court instructed the jury as follows:

"Before we proceed I do want to give you an instruction. Evidence has been presented, ladies and gentlemen, that Christopher Davis told Robbie Horton that Bozo shot him. That testimony is not to be used by you to prove that Bozo shot Christopher Davis, it is admitted only for the purpose of explaining why Robbie Horton spoke to Antoine Sangster concerning the shooting of Christopher Davis. Whether you believe this evidence and the weight you decide to give it, if any, is entirely up to you."

¶ 14 Sangster's counsel objected to this limiting instruction.

¶ 15 Assistant State's Attorney (ASA) Margaret Ogarek testified she memorialized her interview with Horton in the handwritten statement, which Horton reviewed before signing. Horton told her Davis and Sangster were feuding over drug territory and that Davis identified Sangster as the shooter. ASA Ogarek said Horton gave his statement freely with no promises or threats being made, including promises or threats concerning an unrelated pending criminal matter against Horton.

¶ 16 ASA Mary Innes testified she presented Horton to the grand jury and he appeared to be cooperative. She too said no promises or threats were made to entice his testimony and Horton never indicated that anyone forced or threatened him to give testimony. Before the grand jury, Horton admitted to membership in the Four Corner Hustlers street gang and provided street names. Horton told the grand jury that Davis, also a member of the street gang, argued with Sangster over drug territory. Horton described the conversation with Davis in which Davis identified Sangster as the shooter and the conversation in which Sangster admitted shooting Meeks while trying to shoot Davis.

¶ 17 The State called Psallareous Baskin, a Four Corner Hustlers street gang member working for Sangster. Baskin said Sangster went by the street name "Bozo" and he knew Davis by the name "C-Gutta." Although he did not know anything about Sangster's control of drug territory, he knew about the shooting, despite not being there.

¶ 18 Baskin testified he was forced and threatened into giving a handwritten statement, which the State introduced. In it, Baskin acknowledged (i) Sangster and Davis were fighting over drug territory; (ii) he was on the block of North Springfield on June 1, 2006; (iii) he had spoken with Sangster that day; (iv) Sangster told him and LaVonte that when they saw Davis, they should contact him; (v) he did not do so on seeing Davis because he did not want to be responsible for anyone's death; and (vi) 15 minutes later, he saw Sangster near a vacant lot shooting at Davis and Meeks.

¶ 19 ASA Barbara Dawkins testified she memorialized an interview with Baskin on April 9, 2008, in a handwritten statement. She testified Baskin gave his statement voluntarily, without promises or threats, and Baskin read the statement before signing it. In his statement, Baskin identified Sangster as either a four- or five-star universal rank in the Four Corner Hustlers

street gang. In addition, Baskin stated, "[LaVonte] told him he was going to call [Sangster] to tell him that [Davis] was across the street."

¶ 20    LaVonte testified at trial that he had been arrested on a warrant the day before his trial testimony for his failure to appear in court on the previous trial date. LaVonte testified he was charged with murder and attempted murder as Sangster's codefendant, and pled guilty to a reduced charge of aggravated battery, receiving a two-year sentence. During questioning, LaVonte stated, "I don't even want to talk–I ain't got nothing to say" and "Y'all can't make me say nothing." The trial court warned LaVonte that his refusal to answer questions could lead to a finding of contempt of court.

¶ 21    LaVonte testified he was not on Springfield Avenue that day, not a member of a gang, and not familiar with the Four Corner Hustlers street gang. When counsel asked him to identify Sangster, LaVonte claimed he did not know Sangster and did not see "Bozo" in the courtroom. LaVonte testified he had never heard of Meeks or Davis until he was arrested and did not know their street names. He denied telling the police that before the shooting occurred, he called Sangster to notify him Davis was on the block. He claimed the police forced him to make those statements. LaVonte also claimed he was not placed under oath at his plea hearing. When asked to identify a photograph of Sangster, People's Exhibit 27, LaVonte said he could not identify the person depicted or pronounce the name (Sangster) on the photograph. Eventually, however, he identified Sangster's photograph. LaVonte also identified a photograph of Keith Ferguson, People's Exhibit 28. LaVonte claimed he did not identify either Sangster's or Ferguson's photograph during his plea hearing.

¶ 22    During his trial testimony, LaVonte repeatedly denied the following statements at his plea hearing, which, he claimed, he was forced to make: (i) identifying photographs of Sangster and Keith Ferguson; (ii) establishing Meeks's street name to be "Spook" and Davis's to be "Gutta"; and (iii) acknowledging that Sangster and Davis were fighting over drug territory. LaVonte also denied admitting that he "chirp[ed]," meaning he called Sangster when he saw Davis on the block, and 5 to 10 minutes later, Sangster showed up with Keith Ferguson. LaVonte, at his plea hearing, said Sangster and Ferguson came from a vacant lot, shot at Davis, and ran back toward the lot after the shooting. A few days later, LaVonte said he spoke with Sangster, who admitted shooting Meeks, though he was trying to shoot Davis.

¶ 23    When LaVonte denied Sangster's admission to shooting Davis, the State, turning to his plea hearing asked:

> "[STATE]: Page 18. Were you asked these questions, did you give these answers. I want to talk to you now about a couple of days later, did you have a chance to talk to some people about what you saw on June 1, 2006?
>
> Answer: Yes, sir.
>
> Did you ask that question, did you give that answer?
>
>            * * *
>
> [DAVIS]: No, sir.
>
> [STATE]: Whose house were you at paraphrasing?
>
> Answer: My cousin, Devonte Washington.
>
> [STATE]: Who else was there?
>
> Answer: Diamond and spelling Pascalarious, P-a-s-c-a-l-a-r-i-u-s, Baskin."

(Defense counsel objected. During the sidebar, defense counsel argued the State was going into a conversation with Diamond and Baskin which contained hearsay and was irrelevant. The trial court interpreted the testimony.)

"THE COURT: Question, again on page 17, court's interpreting it as testimony by [LaVonte] at the preliminary hearing that he had a conversation with Diamond and Baskin. He told them to make a phone call. And he told them basically a conversation he, [LaVonte], had with Antoine Sangster.

The question then [goes] on to ask what the conversation, what was the conversation after the shooting you had with Antoine Sangster, that's the extent of the conversation. So, in fact, he had this conversation, there's other people frankly is irrelevant because it didn't reveal as what (inaudible) him which may or may not be hearsay so objection will be sustained."

The court instructed the State to move on to Sangster's admission to LaVonte.

¶ 24        When questioning resumed, the State confronted LaVonte with his plea hearing testimony, but he still denied the conversation with Sangster in which Sangster, (1) said he attended Meeks's funeral and placed flowers, and (2) admitted he was trying to shoot Davis when he shot Meeks.

¶ 25        Chicago police detective Ernest Cato testified he investigated the shooting, interviewed Horton and Baskin, and was present when the ASAs memorialized their statements. Cato testified he did not make any threats or promises to either witness to entice his statement.

¶ 26        The parties stipulated that investigator Kim Taylor, working for Sangster, interviewed Baskin at his home on May 12, 2010. During the interview, Baskin told Taylor he had been taken to Area Four detective headquarters and was there for five hours. Taylor would testify that Baskin claimed his statement written by the police was a "lie."

¶ 27        The State sought to introduce a recorded telephone call allegedly made by Sangster from Cook County jail to an unidentified female. At the admissibility hearing, Kathleen Urbanczyk, an employee of the Cook County department of corrections in the criminal intelligence unit, testified that "as a matter of course" calls made by inmates at the Cook County jail are recorded and the recordings are maintained for five years. She testified that when inmates enter the jail, they are registered into the jail's telephone system. The system has a voice recognition component and, before an inmate can place a phone call, he or she must give their personal identification number (PIN) and state their name. If the inmate's voice matches the previously recorded voice, the system activates. But, she explained, if the voice associated with the PIN is not recognized, the phone call cannot be placed. Urbanczyk reviewed a phone call made by Sangster on August 3, 2011, at 8:19 p.m., listening to the call on the jail's system. She copied it to a disc and listened to the disc. She testified that the disc was a true and accurate copy of the original phone call recording.

¶ 28        The trial court, having heard arguments and reviewing case law, held the audio recording to be relevant and admissible. The court stated:

"I do agree with the State's analysis that if it can be established as [defendant] making that call, a call by a defendant in a criminal case making efforts to ensure that a witness, a potential witness against him does not come to court is indicative of consciousness of guilt and it will be relevant for that purpose."

The trial court prohibited the parties from offering any evidence regarding the voice recognition component of placing a call from the jail and held that Urbanczyk could not testify to "anything regarding voice recognition, software, or voice analysis or anything like that as a condition [precedent] to any inmate being able to make such a call."

¶ 29     The trial court acknowledged Sangster's argument that someone else could have used his PIN to place the call, but noted that the individual who placed the call identified himself "without hesitation or qualification as Boz." The court found it significant that the individual who initiated the call was attempting to contact witnesses who were scheduled to testify against Sangster and he knew of the pending court date and the scheduling for jury selection. The trial court found a "sufficient quantum of evidence" that Sangster placed the call and made the statements in the recording.

¶ 30     At trial, Urbanczyk's testimony was substantially the same as her testimony at the admissibility hearing, except she did not testify regarding the voice recognition component of the jail telephone system. The telephone call was published to the jury.

¶ 31     At the beginning of the telephone call, the caller is identified as "Antoine Sangster." The caller instructs the unidentified female to "get another phone" so that she can call someone for him. He provided her with a number for "Wally," the street name of Robbie Horton. When the unidentified female was unable to reach Wally, the caller instructed her to call "Lil Mark" and relay a message. When she was unable to reach Lil Mark, the female suggested calling "D.V." The call to D.V. went to voicemail, but D.V. immediately called back and the unidentified female told D.V. that "Boz" wanted to speak with him. The caller asked D.V. if the State's Attorney had contacted him about the case. D.V. replied that the only person who came to speak with him was Kim (the investigator working for Sangster). The caller instructed the unidentified female to tell D.V. to tell "Vonte," (also known as LaVonte), not to appear in court after the first day because once they picked the jury, they could not stop the trial. At the end of the conversation, the caller asked where D.V. had seen "Vonte" and then asked, "On Springfield or something?"

¶ 32     The parties stipulated that Carolyn Brown would testify that she transcribed the proceedings involving LaVonte's guilty plea. The parties further stipulated to questions and answers contained in the transcript.

¶ 33     Sangster did not present any evidence on his own behalf.

¶ 34     During closing arguments, the State discussed LaVonte's plea agreement, arguing:

> "[LaVonte] talked about a couple days later he was at his cousin Devon Washington's house, who was referred to as D.D., and he talked about Bozo telling him that Bozo went to Frank Meeks's funeral and planted flowers and how Bozo told him he was trying to shoot for Chris Davis."

(The recorded telephone call referred to "D.V.," but the State discusses "D.D.") The State then turned to the recorded telephone call and argued that after Sangster was unable to reach Horton, he asked the woman to call "D.D., LaVonte Davis' cousin," who they were eventually able to get on the phone. The State also argued that according to Baskin's handwritten statement, "[Baskin] was across the street when LaVonte chirped [defendant]. LaVonte told him C-Gutta is out here. I'm going to tell Bozo."

¶ 35     During its rebuttal argument, the State discussed the concept of transferred intent. After discussing the telephone call, the State replayed an excerpt for the jury and argued Sangster's

statement that a witness should not appear in court evidenced consciousness of guilt. The State also informed the jury it would receive an instruction on using prior inconsistent statements as substantive evidence "because the legislature has recognized that gang members come into court and lie." The State then told the jurors they could consider Baskin's statement, Horton's grand jury testimony, and LaVonte's plea hearing testimony as substantive evidence. The State further argued that Davis's prior inconsistent statement was introduced "to show you what he said at another time and what he said was Bozo shot me." The court sustained defense counsel's objection to this last argument.

¶ 36    Following closing arguments, the court *sua sponte* modified the first degree murder instruction to include transferred intent, overruling the defense objection.

¶ 37    Also over defense objections, the court allowed the State to provide the jury with a redacted version of Horton's statement, which revealed that before the shooting LaVonte told Horton he was going to call Bozo to tell him C-Gutta was across the street, and that Horton left the gang after his brother was killed in a gang shooting. In addition, it included a photograph that Horton identified as D.V.

¶ 38    During the first day of deliberations, the jury sent three notes. First, the jury requested a transcript of the recorded jail call. The court responded that while no transcript was available, they would be provided equipment to listen to the recorded call. Two hours later, the jury sent its second note asking:

> "What happens when for certain we know with 100 percent accuracy that we will not come to a unanimous decision by a large margin? Meaning there are people staunchly unwilling to change their vote on both sides. We know this will not come to any other conclusion."

The court told the jury to continue deliberations. After three hours of deliberations, the jury informed the court that one juror was ill. Deliberations ended for the day, and the day the deliberations resumed, the jury found Sangster guilty on both counts.

¶ 39    Sangster's motion for a new trial was denied and he was sentenced to 61 years' imprisonment.

¶ 40                                ANALYSIS

¶ 41    Sangster asks this court to reverse his conviction and remand for a new trial, claiming numerous errors denied him a fair trial. We address each in turn.

¶ 42                Sangster's Claims of Error: Preliminary Question

¶ 43    Regarding all of Sangster's claims of error, the State argues that the evidence was "overwhelming" against him, focusing on three eyewitnesses, including the victim, who identified Sangster as the shooter, Sangster admitting to the shooting on at least two different occasions, and the evidence of witness tampering, which suggests a consciousness of guilt. Sangster counters that the State's version of the trial evidence does not acknowledge "many infirmities in the case." As support for this position, Sangster contends the jury notes show the jury's struggle with the sufficiency of the evidence and, therefore, undermines the State's contention that the evidence was "overwhelming." He also argues: (i) no one identified him as the shooter at trial; (ii) all the witnesses denied seeing the shooter or having information about the shooter; (iii) no physical evidence placed him at the crime scene; and (iv) every witness

who had previously implicated him recanted his prior statement, claiming it was the product of police coercion. Moreover, Sangster attaches significance to the fact that the State's witnesses faced criminal charges themselves at the time they gave their statements and, thus, were potentially motivated to provide false statements to reap a potential benefit for their cases. Sangster further argues the physical evidence conflicted with the accounts of the shooting contained in the prior inconsistent statements the police introduced, namely, that although no witness ever stated the shooter crossed the street before shooting the victims, shell casings recovered at the scene were on the same side of the street and in close proximity to where the victims were standing when they were shot.

¶ 44     Whether the evidence was closely balanced only becomes an issue should we choose to address any of Sangster's claims of error under the plain error doctrine. Before reaching plain error, however, we must determine whether error occurred. We turn our attention to each of defendant's claims of error.

¶ 45                    Foundation for the Recorded Jail Telephone Call

¶ 46     Sangster contends the State did not lay a proper foundation before introducing the audio recording of a telephone call from jail instructing LaVonte not to testify at his trial. The State counters that it furnished a proper foundation under the silent witness theory and the business records exception to the hearsay rule.

¶ 47     The decision of whether evidence should be admitted belongs to the sound discretion of the trial court and, on review, we will not reverse that decision absent an abuse of discretion. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). An abuse of discretion occurs when the ruling is arbitrary or fanciful or where no reasonable person would adopt the trial court's view. *Id.*

¶ 48     In Illinois, a sound recording, which is otherwise competent, material, and relevant, is admissible into evidence if a proper foundation is laid establishing authenticity and reliability of the recording. *People v. Melchor*, 136 Ill. App. 3d 708, 711 (1985). Under the silent witness theory, a recording may be admitted without the testimony of a witness with personal knowledge of what the recording portrays as long as there is sufficient proof of the reliability of the process that produced the recording. *People v. Vaden*, 336 Ill. App. 3d 893, 898 (2003).

¶ 49     Sangster argues the State failed to lay a proper foundation for the admission of the recorded telephone call because no witness testified to the capability of the devices used for recording, the competency of the operators, the proper operation of the recording devices, or the preservation of the recording.

¶ 50     We reject Sangster's argument, and agree with the trial court that the ability of Sangster to make the call and its recording provides sufficient evidence the system was working properly. Through the department of correction employee's testimony, the State presented sufficient proof of the reliability of the process that produced the telephone recording. Urbanczyk testified she was trained to use the system by the actual supplier of the system and that the only way the jail telephone system could be activated was by the caller entering his PIN and saying his or her name.

¶ 51     We note that neither at trial nor before us did Sangster make a colorable claim that the recording was other than authentic or accurate. See *People v. Dennis*, 2011 IL App (5th) 090346, ¶ 28. Where a defendant does not present any actual evidence of tampering, substitution, or contamination, the State need only establish a probability that those things did

not occur. *Id.* Any deficiencies go to the weight, rather than the admissibility, of the evidence. *Id.*

¶ 52　　The trial court found the caller's identification as "Boz," the discussion of the facts of Sangster's case, and the caller's attempts to contact known witnesses, sufficient evidence that Sangster made the call. Based on the evidence presented, we cannot say the trial court's admission of the recorded telephone call under the silent witness theory constituted an abuse of discretion and, therefore, there is no error.

¶ 53　　The State further contends the audio recording of the telephone call was properly admitted as a business record under section 115-5(a) of the Code. 725 ILCS 5/115-5(a) (West 2010). Having found no error in the trial court's admission of the recording under the silent witness theory, we decline the State's invitation to address this alternate argument.

¶ 54　　　　　　　　　　　　　Inconsistent Statements

¶ 55　　Sangster argues the trial court erred in admitting evidence that Davis identified Sangster as the shooter while speaking with Robbie Horton. Sangster maintains that Horton's prior inconsistent statements regarding the identification were inadmissible under section 115-10.1 of the Code because Horton lacked personal knowledge, and his statements of the shooting contained double hearsay. 725 ILCS 5/115-10.1 (West 2010). Sangster further argues that the State should not have been allowed to impeach Davis and Horton on their assertion they did not speak after the shooting because their testimony did not affirmatively harm the State's case. Lastly, Sangster argues Davis's identification should be deemed inadmissible to explain Horton's later actions under the course of conduct hearsay exception.

¶ 56　　　　　　　Robbie Horton's Handwritten Statement and Grand Jury Testimony

¶ 57　　Horton's handwritten statement and grand jury testimony contradicted his trial testimony. The State introduced them as prior inconsistent statements. The State used Horton's handwritten statement to impeach his and Davis's trial testimony. Horton's grand jury testimony was admitted as substantive evidence under section 115-10.1 of the Code. 725 ILCS 5/115-10.1 (West 2010).

¶ 58　　Horton, in both his signed statement and grand jury testimony, claimed he spoke with Davis after the shooting and that Davis identified Sangster as the person who shot Meeks and him. At trial, both Horton and Davis denied they spoke with each other after the shooting.

¶ 59　　Whether a prior statement is inconsistent under section 115-10.1 of the Code and, therefore, admissible as substantive evidence, falls within the sound discretion of the trial court and the decision will be reversed on appeal only if it constitutes an abuse of discretion. *People v. Harvey*, 366 Ill. App. 3d 910, 922 (2006); *People v. Flores*, 128 Ill. 2d 66, 87-88 (1989). An abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful, or unreasonable or when no reasonable person would take the same view. *Illgen*, 145 Ill. 2d at 364.

¶ 60　　Generally, hearsay refers to "an out of court statement *** offered to establish the truth of the matter asserted." (Internal quotation marks omitted.) *People v. Gonzalez*, 379 Ill. App. 3d 941, 954 (2008). As an exception, the prior inconsistent statements of a testifying witness may be admitted to impeach the witness' credibility. *People v. McCarter*, 385 Ill. App. 3d 919, 932 (2008). Additionally, section 115-10.1(c) of the Code provides that a prior inconsistent

statement may be offered not just for purposes of impeachment, but as substantive evidence, if the witness is subject to cross-examination and the statement:

"(1) was made under oath at a trial, hearing, or other proceeding, or

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

(A) the statement is proved to have been written or signed by the witness[.]" 725 ILCS 5/115-10.1(c) (West 2010).

To satisfy the exception's "personal knowledge" requirement, " ' "the witness whose prior inconsistent statement is being offered into evidence must actually have seen the events which are the subject of that statement." [Citations.]' " *McCarter*, 385 Ill. App. 3d at 930 (quoting *People v. Cooper*, 188 Ill. App. 3d 971, 973 (1989)). Accordingly, " '[e]xcluded from this definition are statements made to the witness by a third party, where the witness has no firsthand knowledge of the event that is the subject of the statements made by the third party.' " *McCarter*, 385 Ill. App. 3d at 930 (quoting *People v. Morgason*, 311 Ill. App. 3d 1005, 1011 (2000)). The witness must have observed the events he is speaking of, rather than have heard about them afterwards. *Morgason*, 311 Ill. App. 3d at 1011.

¶ 61    When a prior inconsistent statement meets the basic requirements of reliability under section 115-10.1 of the Code, either party in a criminal case may introduce the prior inconsistent statement as substantive evidence. See *People v. Santiago*, 409 Ill. App. 3d 927, 932-33 (2011). Section 115-10.1 seeks to advance the legislature's goal of "prevent[ing] a 'turncoat witness' from merely denying an earlier statement when that statement was made under circumstances indicating it was likely to be true." *People v. Thomas*, 354 Ill. App. 3d 868, 882 (2004). Thus, under section 115-10.1, testimony under oath in a prior proceeding or a statement concerning a matter within the witness's personal knowledge proved to have been written or signed by the witness can be used as substantive evidence. Therefore, Baskin's statement to the police and LaVonte's testimony at his plea hearing–both to the effect that they personally witnessed Sangster shoot Meeks and Davis–were properly considered by the jury as substantive evidence.

¶ 62    If a prior inconsistent statement is not admissible as substantive evidence, that statement can only be used for impeachment when the testimony of that witness does "affirmative damage" to the party's case. *People v. Cruz*, 162 Ill. 2d 314, 361 (1994) (citing *People v. Bradford*, 106 Ill. 2d 492, 500 (1985)). "It is only when the witness' testimony is more damaging than his [or her] complete failure to testify would have been that impeachment is useful." *People v. Sims*, 285 Ill. App. 3d 598, 610 (1996) (citing *People v. Weaver*, 92 Ill. 2d at 545, 563-64 (1982)). Accordingly, the issue is whether Horton's and Davis's testimony at trial damaged, rather than failed to support, the State's case, such that their inconsistent statements were properly admitted to impeach. See *Sims*, 285 Ill. App. 3d at 610.

¶ 63    Sangster contends Horton lacked personal knowledge of the shooting and simply recounted information provided to him by Davis. Sangster argues Horton's statement contained an additional level of inadmissible hearsay–Davis's out-of-court identification of Sangster to Horton–which falls outside of a hearsay exception. Sangster further argues that because neither Horton nor Davis affirmatively damaged the State's case when they denied speaking with each other after the shooting, their prior inconsistent statements should not have been admitted for impeachment purposes.

¶ 64    The State contends Horton's handwritten statement was never admitted as substantive evidence, but for a proper reason–"solely for its impeaching effect upon the credibility of the witness." And, LaVonte and Horton "attempted to positively aid" Sangster by disavowing their prior statements and testifying that they were the result of coercion.

¶ 65    The State concedes any claim of error regarding the impeachment of Horton was preserved, but argues Sangster forfeited his claim of error as it related to the impeachment of Davis because Sangster failed to object at trial or include the issue in a posttrial motion. Sangster argues the error should be considered under the first prong of the plain error doctrine because the evidence was closely balanced. Alternatively, Sangster asks us to review the issue as one of ineffective assistance of counsel.

¶ 66    We note that the rule of waiver is a limitation on the parties, not the court. See *People v. Williams*, 188 Ill. 2d 293, 301 (1999). Because Sangster's claim of error rests on his right to a fair trial, we will not apply the waiver rules, and instead, we choose to address the merits. We first determine whether any reversible error occurred. If we find error, we then will consider whether the error is sufficiently grave to be plain error as Sangster contends or ineffective assistance of counsel.

¶ 67    The State argues this case more closely resembles the facts in *People v. Donegan*, 2012 IL App (1st) 102325, a decision written by Justice Patrick Quinn, in which this court found affirmative damage and, thus, allowed the witnesses' prior inconsistent statements. Sangster, on the other hand, argues the facts are more similar to *People v. McCarter*, 385 Ill. App. 3d 919 (2008), a decision written by Justice Joseph Gordon, in which this court found no affirmative damage and disallowed impeachment with the prior inconsistent statements. Sangster argues the witnesses' failure to incriminate him in the present case did not "affirmatively hurt" the State or help Sangster because neither witness exculpated him and none of their trial testimony was inconsistent with the State's charges.

¶ 68    We need not address *McCarter* and *Donegan*. No "affirmative damage" analysis is necessary because, even if we were to find the trial court erred in allowing the State to impeach Horton and Davis with Horton's statement and grand jury testimony regarding his conversation with Davis, the evidence against Sangster that could be considered substantively by the jury was so overwhelming, the error, if any, was harmless. An error is harmless " 'where there is no *reasonable probability* that the jury would have acquitted the defendant absent the' error." (Emphasis in original.) *In re E.H.*, 224 Ill. 2d 172, 180 (2006) (quoting *People v. Nevitt*, 135 Ill. 2d 423, 447 (1990)). Baskin's statement to the police identifying Sangster as the shooter and LaVonte's plea hearing testimony doing the same, coupled with Sangster's admissions to Horton and LaVonte that he meant to kill Davis, not Meeks, provide powerful evidence in support of the jury's verdict. Further, evidence regarding Sangster's motive to kill Davis, as well as his attempt to prevent a witness from testifying, are strong circumstantial evidence of his guilt.

¶ 69    While Sangster takes issue with allowing the State to introduce the lead-in to Horton's question to Sangster ("they are saying you killed Spook") as double hearsay, Sangster does not contend that his admission to both Horton and LaVonte that he was trying to hit Davis, when he shot Meeks, should have been barred. Sangster also concedes that the State could properly have asked a question along the lines of "When you asked Sangster about Meeks's death, what did he say?" (*i.e.* eliminating the double hearsay lead-in) and, thus, the jury was going to hear

Sangster's response in any event. In the absence of any evidence of prejudice, we decline to reverse on this issue.

¶ 70 Finding the error, if any, to be harmless, we need not address Sangster's ineffective assistance of counsel claim.

¶ 71 Davis's Out-of-Court Identification of Sangster as the Shooter

¶ 72 Sangster contends the trial court erred in allowing Davis's statement identifying him as the shooter to Horton to be admitted under the course of conduct hearsay exception because it included more detail than was necessary. Sangster argues the erroneous admission of Davis's identification was extremely prejudicial, especially because the State argued during rebuttal that the jury could consider Davis's identification as substantive evidence.

¶ 73 Over defense counsel's objection, the trial court allowed the State to introduce testimony from Horton concerning his prior statements that he spoke with Davis after the shooting and that Davis identified Sangster as the shooter. The trial court ruled that the statement was "admissible not for the truth of the matter asserted but simply to show Horton's state of mind with respect to why he would have a conversation with [defendant.]" The State offered evidence that Horton provided a signed statement and testified before the grand jury, and during both consistently stated that Davis told Horton that Sangster shot him (Davis) and Meeks. The State called two ASAs who confirmed the substance of Horton's prior inconsistent statement and grand jury testimony and introduced the transcript of Horton's grand jury testimony.

¶ 74 Sangster argues the State need not have offered evidence to explain why Horton spoke with Sangster about the shooting. Sangster contends that because Horton's trial testimony established that he belonged to a gang with Sangster, Davis, and Meeks, and that in addition to their gang affiliation, he was friends with Sangster, there was no need for the State to explain to the jury why Horton spoke with Sangster after the shooting. Sangster further contends that even if relevant, the cumulative effect of the State's evidence went beyond explaining Horton's course of conduct in speaking with Sangster. According to Sangster, the State only needed to elicit that Horton spoke with Davis, without disclosing the content of that conversation, and then had a conversation with Sangster about the shooting.

¶ 75 The State contends that without the conversation between Davis and Horton, Sangster's admission to Horton would have "seemed purely coincidental." The State contends the substance of the conversation between Davis and Horton was necessary to explain why Horton spoke with Sangster and why Sangster admitted to him that he committed the shooting. The State's position is that Davis's out-of-court identification of Sangster does not constitute inadmissible double hearsay as Sangster suggests, but was admitted to show its effect on Horton and explain Horton's course of conduct. The State further argues the trial court's limiting instruction emphasized the evidence's limited admissibility.

¶ 76 " 'Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted, and it is generally inadmissible due to its lack of reliability unless it falls within an exception to the hearsay rule.' " *People v. Caffey*, 205 Ill. 2d 52, 88 (2001) (quoting *People v. Olinger*, 176 Ill. 2d 326, 357 (1997)). Statements that are offered to show their effect on the listener or to explain the listener's subsequent course of conduct are not hearsay. *People v. Carroll*, 322 Ill. App. 3d 221, 223 (2001).

¶ 77     The State cites *People v. Robinson*, 391 Ill. App. 3d 822 (2d Dist. 2009), and *People v. Gonzalez*, 379 Ill. App. 3d 941 (1st Dist. 2008), in support of its position. Both cases involved interactions between the defendant and the police, a distinction Sangster finds significant, but we do not.

¶ 78     The trial court did not abuse its discretion in admitting the substance of Davis's out-of-court identification of Sangster as the shooter to explain Horton's course of conduct. Moreover, even if we assume, *arguendo*, that the trial court improperly admitted Davis's statement, the trial court's limiting instruction cured any prejudice. We can presume the jury followed the court's limiting instruction and considered Davis's statement only to explain the effect it had on Horton in pursuing a conversation with Sangster about the shooting. See *People v. Taylor*, 166 Ill. 2d 414, 438 (1995) ("The jury is presumed to follow the instructions that the court gives it.").

¶ 79     Sangster further contends the State improperly impeached Davis and Horton with Davis's identification of Sangster. Sangster argues the evidence was improper because it was not presented for a limited purpose where the State elicited the contents of the conversation four separate times and told the jury, during closing arguments, that it could consider the impeachment evidence as substantive evidence.

¶ 80     We find no error in the trial court's admission of Davis's identification of Sangster as the shooter. As discussed above, Horton's statements, which included Davis's identification of Sangster as the shooter, were properly admitted to impeach both Horton and Davis. Although the State suggested during rebuttal argument that Davis's statement was substantive evidence, the trial court sustained defense counsel's objection and provided the jury with a limiting instruction explaining that the statement was to be used only to explain why Horton chose to speak with Sangster.

¶ 81     Finding Davis's statement was properly used as impeachment evidence, there was no reason for defense counsel to object. See *People v. Holmes*, 397 Ill. App. 3d 737, 745 (2010) ("It is axiomatic that a defense counsel will not be deemed ineffective for failing to make a futile objection." (citing *People v. Lawton*, 212 Ill. 2d 285, 303 (2004)). Therefore, Sangster has failed to establish a claim of ineffective assistance on these grounds.

¶ 82              Inadmissible Hearsay: Horton's Grand Jury Testimony and Baskin's Statement

¶ 83     At trial, the State impeached Horton with his grand jury testimony and admitted his testimony as substantive evidence because it was sworn testimony. The State impeached Baskin with his handwritten statement and informed the jury that the statement constituted substantive evidence because he signed it and it detailed events about which Baskin had personal knowledge. Sangster contends Horton's grand jury testimony and Baskin's statement contain numerous inadmissible hearsay statements, and the improper admission of the hearsay statements prejudiced him because it presented the jury with anonymous identifications of Sangster as the shooter, added credibility to the State's argument that Sangster was the individual who placed the recorded jail call, and corroborated LaVonte's recanted account of the shooting.

¶ 84     Sangster acknowledges his counsel failed to object to each piece of the inadmissible hearsay at trial, but asks this court to reverse his conviction and remand for a new trial, claiming the admission of the statements constitutes plain error and ineffectiveness of counsel.

- 14 -

¶ 85    Sangster characterizes as double hearsay Horton's grand jury testimony that he told Sangster "they are saying you killed Spook," citing *People v. Radovick*, 275 Ill. App. 3d 809 (1995) (even if statement is admitted substantively under section 115-10.1 of Code, that section does not abrogate other rules of evidence, including ban on double hearsay). Sangster acknowledges to the extent that it was inconsistent with his trial testimony, Horton's grand jury testimony was substantively admissible under section 115-10.1, but "only so far as it did not contain evidence which was inadmissible for other reasons." Sangster considers the unattributed identification of him as the shooter contained in Horton's statement ("they are saying you killed Spook") to be classic hearsay–the statement was offered to prove the truth of the matter asserted, that Sangster shot Meeks, and as such, was inadmissible. Relying on *Radovick*, Sangster argues the trial court should have redacted the portions of Horton's grand jury testimony which contained the inadmissible double hearsay.

¶ 86    The State contends Sangster failed to preserve the complained-of issues for appellate review because he did not object at trial or include the issues in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176 (1988). That aside, the State maintains the complained-of statements were properly admitted because they were not being offered for the truth of the matter asserted. The State contends the statement contained in Horton's grand jury testimony ("they are saying you killed Spook") was admissible to show the effect it had on Horton and his course of conduct.

¶ 87    Horton testified at trial that he did not have a conversation in which Sangster admitted to him that he shot Meeks and Davis. The State impeached Horton with his grand jury testimony. ASA Innes testified she presented Horton to the grand jury and that he testified, "I asked [defendant] about Spook being killed. I told him, you know, they are saying you killed Spook and he said yeah, but that wasn't for Spook." The State contends the statement places the conversation between Horton and Sangster in context and explains why Horton initiated the conversation.

¶ 88    The trial court properly admitted the statement for the purpose of providing context for the conversation between Horton and Sangster and explaining why Horton initiated the conversation with Sangster. It was not offered for the truth of the matter asserted. We find no abuse of discretion by the trial court in admitting the statement.

¶ 89    Next, Sangster contends the trial court erred by allowing the jury to consider the unredacted portion of Horton's handwritten statement in which he discussed leaving the gang after a gang-related slaying of his brother. Sangster argues Horton's explanation for why he left the gang was inadmissible under section 115-10.1 because the State never questioned Horton at trial about the reasons he left the gang and, therefore, the statement was irrelevant. Sangster argues the evidence prejudiced him because it informed the jury of a shooting in which the Four Corner Hustlers street gang was involved and portrayed the gang as a violent organization, which painted him in a negative light.

¶ 90    The State responds that the statement was properly admitted because it provided context for Horton's statements that despite leaving the gang, he was familiar with the members of the gang. Sangster contends the portion of Horton's statement regarding how his brother was killed was not impeaching and should have been redacted as irrelevant and prejudicial.

¶ 91    We find nothing unreasonable about the trial court's decision not to redact the statement. Moreover, even if we were to find the evidence irrelevant and, therefore, its admission to be in error, the error would be harmless because there is no reasonable probability that the verdict

would have been different had the evidence been redacted. See *People v. Cortes*, 181 Ill. 2d 249, 285 (1998) ("If the error is unlikely to have influenced the jury, admission will not warrant reversal.").

¶ 92   Sangster further contends the photograph of LaVonte was improperly admitted because the State never questioned Horton about D.V. Sangster admits, however, that Horton acknowledged that five photographs were appended to his handwritten statement, on which he had written the street names of the individuals depicted. Also, Sangster ignores the evidence that Sangster spoke with D.V. from jail, instructing him to tell LaVonte not to appear in court.

¶ 93   Generally, if photographs are relevant to prove facts at issue, they are admissible. *Brooke Inns, Inc. v. S&R Hi-Fi & TV*, 249 Ill. App. 3d 1064, 1087 (1993). The decision to admit photographs into evidence is left to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. *Id.* Sufficient evidence exists here to support the admission of the photograph, but even if we were to find the photograph irrelevant and immaterial, its admission was harmless because the photograph cannot be considered vital to defendant's conviction. See *Smith v. Baker's Feed & Grain, Inc.*, 213 Ill. App. 3d 950, 953 (1991) (finding error in admitting photograph did not mislead jury on any issue in dispute).

¶ 94   Lastly on this issue, Sangster contends Baskin's statement that LaVonte told him that he planned to call Sangster to alert him to Davis's location was inadmissible hearsay. When Baskin denied witnessing the shooting during his trial testimony, the State impeached him with his handwritten statement in which he provided a first-hand account of the shooting. Baskin stated, "Vonte told him he was going to call Bozo … to tell him that C-Gutta was across the street."

¶ 95   Sangster contends Baskin's statement was erroneously introduced as substantive evidence under section 115-10.1 of the Code because it constituted double hearsay. 725 ILCS 5/115-10.1 (West 2010). Sangster argues LaVonte's out-of-court statement to Baskin was offered for the truth of the matter asserted–that LaVonte called Sangster to notify him of Davis's location before the shooting. Sangster argues the introduction of Baskin's statement prejudiced him because it corroborated LaVonte's recanted claim that he contacted Sangster before the shooting and bolstered the credibility of LaVonte's recanted account.

¶ 96   The State contends that under section 115-10.1 of the Code Baskin's statement was properly admitted as substantive evidence. 725 ILCS 5/115-10.1 (West 2010). Baskin's prior statement was inconsistent with his trial testimony, he was subjected to cross-examination, and the statement is based on his personal knowledge.

¶ 97   We find the trial court properly acted within its discretion in admitting Baskin's statement concerning what LaVonte told him to impeach his trial testimony. At trial, Baskin testified he was not present when the shooting occurred and did not witness it. His earlier statement that LaVonte told him that he was going to call Sangster contradicts his trial testimony that he was not present. We find no error.

¶ 98                                    Jury Instruction

¶ 99   Sangster contends the trial court erred by amending the jury instruction to include the concept of transferred intent.

¶ 100   Following the parties' closing arguments, the trial court *sua sponte* amended Illinois Pattern Jury Instructions, Criminal, No. 7.02 (4th ed. 2000) (hereinafter, IPI Criminal 4th

- 16 -

No. 7.02) to include the language "or another" to encompass the concept of transferred intent. The instruction read:

> "To sustain a charge of first degree murder, the State must prove the following propositions: First that the defendant, or one for whose conduct he is legally responsible, performed the acts which caused the death of Frank Meeks; and second that when the defendant, or one for whose conduct he is legally responsible did do, he intended to kill or do great bodily harm to Frank Meeks *or another*, or he knew that his acts created a strong probability of death or great bodily harm to Frank Meeks *or another*." (Emphases added.)

¶ 101    Sangster contends he was denied a fair trial. "The trial court's decision to broaden the scope of the first-degree murder count introduced a new theory of guilt," maintains Sangster, and the new theory was introduced after defense counsel's closing argument and, therefore, counsel had no chance to defend against it. The State counters that the new instruction correctly stated the law and was appropriate based on the evidence at trial. We agree with the State.

¶ 102    During closing argument, defense counsel argued the State presented different theories of guilt, "I mean under the best case scenario for the prosecutors, if you *** pick and choose parts of the testimony from whatever happened in the Grand Jury or handwritten and ignore other parts, it was an accident." Counsel further argued, "You'd have to pick and choose but even under the best case scenario, it was an accident because there is no motive [for] him to shoot and kill Frank Meeks." The State first mentioned the concept of transferred intent during its rebuttal argument, responding that Meeks's death was not an accident. The State argues that "[h]ad defendant not suggested that he could not be convicted if Meeks was killed accidentally, the People would not have had to discuss transferred intent, and the trial court would not have had to amend the jury instruction."

¶ 103    Relying on *People v. Millsap*, 189 Ill. 2d 155 (2000), Sangster argues "the question is not whether the instruction was an accurate statement of the law, but whether the instruction submitted a new theory to the jury after the case has been sent to the jury, or here, after the close of evidence."

¶ 104    In *Millsap*, the defendant was charged with robbery and home invasion. *Millsap*, 189 Ill. 2d at 159. The State did not pursue an accountability theory, nor did it request that the jury be instructed on accountability. *Millsap*, 189 Ill. 2d at 159. The jury sent the judge a note during deliberations asking, " '[i]s the accomplice just as guilty [as] the offender who causes an injury in a home invasion?' " *Millsap*, 189 Ill. 2d at 159. In response, the trial judge proposed instructing the jurors on accountability; the defendant objected. *Millsap*, 189 Ill. 2d at 159. The trial court gave the instruction reasoning that the evidence supported it. *Millsap*, 189 Ill. 2d at 159. The jury found the defendant guilty on both charges. *Millsap*, 189 Ill. 2d at 160. The defendant appealed, arguing the court erred in instructing the jury on a new theory after the jury had begun deliberations. *Millsap*, 189 Ill. 2d at 160. The appellate court affirmed, holding that an accountability instruction was appropriate on the facts, and that a trial court has a duty to answer jurors' questions when the jurors request clarification on a point of law. *Millsap*, 189 Ill. 2d at 160. The defendant appealed to the supreme court, arguing the trial court's instruction on a new theory deprived him of his right to a fair trial. The defendant argued that the timing of the court's instruction prevented him from addressing the accountability issue during closing arguments. *Millsap*, 189 Ill. 2d at 161. The supreme court noted that the jury instructions

should be settled before closing arguments, so that the attorneys can tailor their arguments accordingly. In reversing, the supreme court pointed to the trial court having instructed the jury on accountability after the jury had begun its deliberations, thereby entirely depriving the defendant's attorney of an opportunity to defend against that theory. *Millsap*, 189 Ill. 2d at 164-65.

¶ 105    The State distinguishes *Millsap*, arguing that unlike the jury in *Millsap*, which received the amended jury instruction mid-deliberations, the jury here received the challenged instruction after the close of evidence. The State argues it is significant that the trial court gave the instruction on transferred intent only after Sangster contended in his closing argument that he could not be found guilty of murder if the killing was an accident and the State responded in rebuttal with the concept of transferred intent.

¶ 106    Sangster argues this distinction is of no significance. He contends it makes no difference whether the new, broader theory of guilt was introduced mid-deliberations, as in *Millsap*, or after the close of evidence, as in his case, because either way, Sangster had no chance to adjust his theory of defense.

¶ 107    While jury instructions must be settled before closing arguments (see 735 ILCS 5/2-1107(c) (West 2010); Ill. S. Ct. R. 451(c) (eff. July 1, 2006)), the State contends that the trial court's decision to amend the instruction to include the theory of transferred intent is supported by section 2-1107(c) of the Code:

"If as a result of the arguments to the jury the court determines that additional instructions are desirable, the court may after a further conference with counsel approve additional instructions." 735 ILCS 5/2-1107(c) (West 2010).

The State further argues the trial court had authority to amend the instructions under Illinois Supreme Court Rule 451(f) (eff. Apr. 8, 2013), which states, "[n]othing in the rule is intended to restrict the court's authority to give any appropriate instruction during the course of the trial."

¶ 108    Alternatively, the State suggests that the jury instruction on transferred intent did not introduce a new theory of guilt, that is, the elements of IPI Criminal 4th No. 7.02 did not change by adding the "or another" language. The State cites *People v. Leach*, 2011 IL App (1st) 090339, ¶ 7, as support for its position that because the amended instruction contained the same elements as the original instruction, the trial court's decision to amend the instruction was proper and *Millsap* is inapposite.

¶ 109    In *Leach*, the trial court withdrew the original jury instruction for aggravated discharge of a firearm after the jury had already begun deliberating and gave the jury a new instruction for aggravated discharge of a firearm in response to the jury question, " 'Does the Aggravated Discharge charge only apply to shooting in the direction of Anthony White?' " *Leach*, 2011 IL App (1st) 090339, ¶ 17. The new instruction removed the name of the alleged victim and replaced it with "another person." *Leach*, 2011 IL App (1st) 090339, ¶ 19. The only difference between the two instructions was that the first one contained the alleged victim's name and the second one did not. *Leach*, 2011 IL App (1st) 090339, ¶ 24. This court held the victim's name was not a necessary element of the offense of aggravated discharge of a firearm. *Leach*, 2011 IL App (1st) 090339, ¶ 24. The second instruction contained the same two elements for aggravated discharge of a firearm as the first instruction and, therefore, this court found the second instruction did not introduce a new theory of liability. *Leach*, 2011 IL App (1st) 090339, ¶ 24.

- 18 -

¶ 110     Sangster argues *Leach* is inapposite. He contends that throughout the whole trial, all of the attorneys involved proceeded with the understanding that Sangster was charged with an intent to shoot and kill Frank Meeks. He contends the victim's name was an essential element of the offense. Sangster finds it significant that only during rebuttal argument did the State bring up the doctrine of transferred intent. Because of the timing of the instruction, Sangster was precluded from defending against the new theory of guilt. He argues the court's actions constitute reversible error, warranting a new trial.

¶ 111     As an initial matter, we note that Sangster has forfeited review of this claim because he failed to include the issue in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 185-86 (1988). Sangster asks us to review the error under the plain error doctrine. Before undergoing a plain error analysis, we must first determine whether error occurred. We hold it did not.

¶ 112     The trial court's decision to amend the jury instruction was proper. By amending IPI Criminal 4th No. 7.02 to include the language "or another," the trial court did not introduce a new theory of guilt as Sangster suggests. Unlike the defendant in *Millsap*, here Sangster was not deprived of an opportunity to defend against the theory of transferred intent because the elements the State needed to prove to establish Sangster's guilt did not change with the addition of "or another." As we held in *Leach*, "whether the trial court's instruction constituted a new theory of liability depends on whether the elements in the new *** instruction differed from the elements in the [amended] one." *Leach*, 2011 IL App (1st) 090339, ¶ 19. After the amendment, the State still had to prove that Sangster, or one whose conduct he was legally responsible for, performed the acts which caused death, he intended to kill or do great bodily harm, and he knew that his acts would cause death or created a strong probability of death or great bodily harm. 720 ILCS 5/9-1 (West 2006). The only difference in the instruction, just as in *Leach*, was the name of the victim. The amended instruction contained the same elements as the original instruction and, therefore, the trial court's decision to amend the instruction to reflect the evidence as it was presented was not an abuse of discretion.

¶ 113     Moreover, the trial court's amendment of the jury instruction was a direct response to defense counsel's argument that Sangster could not be held liable for the shooting because he did not intend to kill Meeks, but rather intended to kill Davis. The trial court properly instructed the jury on the doctrine of transferred intent after defense counsel opened the door to the concept. The State did not raise the doctrine in its opening statement or closing argument, addressing it for the first time in its rebuttal to defense counsel's closing argument. It was only after defense counsel suggested that the shooting could not lead to culpability for Sangster because "even under the best case scenario, it was an accident because there was no motive [for] him to shoot and kill Frank Meeks," that the State responded that Meeks's death was not an accident and discussed the concept of transferred intent. Subsequently, the court amended the jury instruction to include the language "or another" to encompass the concept. The court's decision was proper because "when defense counsel provokes a response, the defendant cannot complain that the prosecutor's reply denied him a fair trial." *People v. Hudson*, 157 Ill. 2d 401, 445 (1993). The amendment to the jury instruction would not have occurred had defense counsel never suggested the jury should acquit Sangster if it found Meeks was killed accidentally.

¶ 114     The trial court had authority to amend the instruction under Illinois Supreme Court Rule 451(f), which provides, "[n]othing in the rule is intended to restrict the court's authority to give any appropriate instruction during the course of the trial." Ill. S. Ct. R. 451(f) (eff. Apr. 8,

2013). The trial court properly instructed the jury on the applicable legal rules based on the evidence presented at trial and the parties' theories based on that evidence.

¶ 115    The trial court's decision to *sua sponte* amend the jury instruction was not an abuse of discretion. The instructions, as given, fully and fairly informed the jury on the applicable law. Having found no error, we need not address the doctrine of plain error.

¶ 116                     Propriety of the State's Closing Arguments

¶ 117    Lastly, Sangster contends the prosecutor discussed excluded evidence and made generalizations about gang members during closing arguments and these comments deprived him of his right to a fair trial, particularly when coupled with the trial court's failure to promptly correct the State's misconduct with either cautionary instructions or admonishments.

¶ 118    As the State observes, and Sangster admits, he waived review of this issue by failing to timely object to the portions of the State's argument he now challenges. See *People v. Brown*, 185 Ill. 2d 229, 252 (1998). Again, Sangster urges us to review the issue under plain error. But, before plain error can be established, reversible error must be shown.

¶ 119    The prosecution is generally given "wide latitude" in making its closing argument. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005); *People v. Blue*, 189 Ill. 2d 99, 127 (2000). In closing, the prosecutor may comment on the evidence and any "fair, reasonable inferences" from it, even if those inferences reflect negatively on the defendant. *Nicholas*, 218 Ill. 2d at 121. But, the closing argument must serve a purpose other than merely "inflaming the emotions of the jury." *Nicholas*, 218 Ill. 2d at 121; *People v. Tiller*, 94 Ill. 2d 303, 321 (1982).

¶ 120    We will not disturb the trial court's determination of the propriety of the prosecution's closing argument absent a clear abuse of discretion resulting in manifest prejudice to the defendant. *People v. Cisewski*, 118 Ill. 2d 163, 175 (1987). A "prosecutor's comments in closing argument will result in reversible error only when they engender 'substantial prejudice' against the defendant to the extent that it is impossible to determine whether the verdict of the jury was caused by the comments or the evidence." *People v. Macri*, 185 Ill. 2d 1, 62 (1998). In reviewing allegations of prosecutorial misconduct during closing argument, the remarks must be viewed in the context of the entire arguments of the prosecution and the defense. *People v. Wheeler*, 226 Ill. 2d 92, 122 (2007).

¶ 121    Sangster contends the prosecutor's closing argument improperly recounted the substance of LaVonte's prior consistent statement and relied on excluded testimony to bolster the reliability of other evidence in light of the trial court's ruling that the State must not introduce evidence that LaVonte shared a consistent account of Sangster's admission of guilt with other individuals.

¶ 122    During LaVonte's direct examination, he denied he witnessed the shooting and denied Sangster told him he shot Meeks while trying to shoot Davis. In confronting LaVonte with his plea hearing testimony, the State asked him to confirm the accuracy of his earlier testimony:

> "Question: I want to talk now about a couple days later [after] speaking with defendant about the [shooting], did you have a chance to talk to some people about what you saw on June 1, 2006?
>
> Answer: Yes, Sir."

LaVonte denied the truth of that exchange. The prosecutor asked about more testimony:

> "Question: Whose house were you at paraphrasing?

Answer: My Cousin, Devonte Washington.

Question: Who else was there?

Answer: Diamond and Psallareous Baskin."

Before LaVonte responded, defense counsel objected. The court sustained the objection and instructed the State to move on to a different portion of the plea hearing in which LaVonte, under oath, discusses defendant's admission to him.

¶ 123 During closing argument, the prosecutor argued that during LaVonte's plea hearing, he

"talked about a couple days later he was at his cousin Devon Washington's house, who was referred to as D.D., and he talked about Bozo telling him that Bozo went to Frank Meeks's funeral and planted flowers and how Bozo told him he was trying to shoot for Chris Davis."

While discussing the recorded call Sangster made from jail, the State argued Sangster asked the woman to call "D.D., Davis's cousin."

¶ 124 Sangster argues the prosecutor's comments were improper because a prior consistent statement cannot be used to bolster the credibility of a witness. Sangster contends the excluded evidence concerning what LaVonte told others while at his cousin's house: (i) constituted an inadmissible prior consistent statement the State improperly discussed to strengthen the credibility of LaVonte's recanted testimony implicating Sangster; (ii) presented new evidence during closing argument for the jury to consider because that testimony at his plea hearing was never admitted at trial; and (iii) violated the trial court's ruling precluding the prosecutor from eliciting any testimony about conversations LaVonte had with other individuals regarding his conversation with Sangster.

¶ 125 The State contends the prosecutor's arguments did not violate the trial court's ruling and did not reference excluded evidence. Before his testimony, LaVonte pled guilty and received two years' imprisonment. At trial, LaVonte was hostile and uncooperative during his testimony. The State claims that because of LaVonte's attempt to affirmatively damage its case, the State was required to use his guilty plea hearing to impeach him with his prior inconsistent statement. Moreover, had defense counsel believed the State was in violation of the trial court's ruling, an objection should have been made.

¶ 126 Contrary to Sangster's claims, the prosecutor did not violate the trial court's ruling. Although the prosecutor did state that Davis was at Washington's house when he talked about Sangster's admission of guilt, he did not mention Baskin or Diamond, or get into the substance of Davis's conversation with those individuals. The prosecutor's statements properly gave context to Davis's statements regarding Sangster's admission of guilt. Furthermore, the jury was instructed that closing arguments were not evidence. Accordingly, any error that may have occurred can be considered cured. See *People v. Garcia*, 231 Ill. App. 3d 460, 469 (1992) (jury instruction that arguments are not evidence tends to cure any prejudice from improper remarks). We hold the prosecutor's comment did not amount to reversible error.

¶ 127 Next, Sangster contends the prosecutor's statement that "gang members come in to court and lie" was improper because it had no basis in the evidence. The State argues the prosecutor's comment regarding the truthfulness and credibility of gang members was based on the evidence or, at the very least, a reasonable inference from the evidence.

¶ 128 In rebuttal, the prosecutor, in discussing the credibility of Horton, Baskin, LaVonte, and Davis, argued:

"[O]ne of the instructions the judge is going to give you talks about the circumstances and the reason you get this instruction is because the legislature has recognized that gang members come into court and lie. *** That instruction reads: The believability of a witness may be challenged by evidence that on some former occasion he made a statement that was not consistent with his testimony in this case."

¶ 129 Sangster urges that by claiming the "law acknowledges" such behavior in situations involving inconsistent statements by gang members, the prosecutor "compounded the error by invoking the integrity of the State's Attorney's Office and backing the statement with the authority of law itself without any foundation for the argument."

¶ 130 After reviewing the closing arguments in their entirety and considering the challenged remarks in context, we find reasonable the prosecutor's argument that the gang members were untruthful and not credible based on the evidence presented. The witnesses who recanted their prior statements all belonged to the Four Corner Hustlers street gang. The State offered evidence that Sangster instructed a fellow gang member not to testify at trial. The witnesses that gave prior statements implicating Sangster all claimed those statements were forced or coerced, even though before trial, when they gave their statements, they affirmed the statements were voluntary. We find no error in the prosecutor's statements.

¶ 131 Moreover, even if we were to find the prosecutor's statements to be improper, they do not reach the level of reversible error. Sangster has failed to show the statements resulted in substantial prejudice. Unless it can be shown that the remark resulted in substantial prejudice to the defendant, errors in closing arguments are considered harmless. *People v. Johnson*, 149 Ill. 2d 118, 145 (1992). The trial court did not abuse its discretion in allowing the prosecutor's closing arguments. Finding no error in the prosecutor's comments, this court does not have to reach either prong of a plain error analysis.

¶ 132                                          CONCLUSION

¶ 133 We hold the trial court properly exercised its discretion in admitting defendant's recorded jail telephone conversation by finding a proper foundation for the call was laid under the silent witness theory. We find no reversible error in the trial court's decision to admit Robbie Horton and Psallareous Baskin's prior inconsistent statements as substantive evidence and for impeachment purposes. We hold Christopher Davis's identification of defendant as the shooter was properly admitted for impeachment purposes and to show the effect on Horton and his course of conduct. Further, we uphold the trial court's decision to *sua sponte* amend the jury instruction finding nothing improper about its decision to do so where the amended instruction fairly instructed the jury of the law applicable to the theories raised by the State and defense. Lastly, we find no error in the prosecutor's closing argument. The prosecutor did not violate the trial court's ruling and did not reference excluded evidence; further, we find the prosecutor's comments regarding the truthfulness of gang members to be based on the evidence. For the foregoing reasons, we affirm the judgment.

¶ 134         Affirmed.