# Illinois Official Reports

## Appellate Court

---

### *People v. Blakey*, 2015 IL App (3d) 130719

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MORGAN D. BLAKEY, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-13-0719 |
| Filed | November 25, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Henry County, No. 12-CF-78; the Hon. Ted J. Hamer, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier and Kerry J. Bryson (argued), both of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>Matthew P. Schutte, State's Attorney, of Cambridge (Laura E. DeMichael-Bialon (argued), of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE McDADE delivered the judgment of the court, with opinion.<br>Justices Lytton and O'Brien concurred in the judgment and opinion. |

¶ 1 The defendant, Morgan D. Blakey, was convicted of aggravated driving under the influence (DUI) (625 ILCS 5/11-501(a)(3), (d)(1)(F), (d)(2)(G) (West 2010)) and was sentenced to 12 years of imprisonment. On appeal, the defendant argues that: (1) the circuit court erred when it admitted the out-of-court statement Theodore Fritch made in the vehicle in the moments before the crash and (2) the defendant's sentence was excessive. We affirm.

¶ 2 FACTS

¶ 3 On November 29, 2011, the defendant was the 19-year-old driver of a vehicle carrying four passengers that crashed at approximately 4:26 p.m. in Henry County after the defendant lost consciousness while driving. The three passengers in the rear of the vehicle died as a result of the crash.

¶ 4 On March 1, 2012, the State charged the defendant by indictment with reckless homicide (720 ILCS 5/9-3(a) (West 2010)) and aggravated DUI (625 ILCS 5/11-501(a)(3), (d)(1)(F), (d)(2)(G) (West 2010)). The indictment alleged that the defendant lost consciousness while driving because he inhaled, or "huffed," from a can of compressed air.

¶ 5 The circuit court held a bench trial over three days in June 2013, at which the court also ruled on a motion to suppress the statement the defendant gave to the police while in the hospital. Jon Hornback, a Henry County deputy sheriff, testified that he was dispatched to the scene of the accident. When he arrived, medical personnel and Kewanee police officers were already on the scene. There were five males involved in the crash; three of whom had not been wearing seat belts and did not survive. Their names were Kelsey Clifford, Levi Berg, and Bradley Wood. The defendant and Theodore Fritch survived the crash; they were conscious and alert but injured. Hornback spoke with the defendant at the scene and asked him what had happened. The defendant told him that they had just been at Wal-Mart and were going down the road, but he could not remember anything after that. Hornback also spoke with Fritch, who also said they had just come from Wal-Mart.

¶ 6 Hornback testified that he was also a state-certified accident reconstructionist. He did not perform measurements on the scene until the following day because it had gotten dark. He prepared a diagram of the crash, which was introduced into evidence. By Hornback's calculations, the vehicle had been traveling south down the road when it veered east off of the roadway, hit a mailbox, and continued down the ditch approximately 342 feet. The vehicle came to a driveway and launched into the air, traveling approximately 114 feet, and came down nose-first. The vehicle then flipped and landed 40 feet away, then rolled for another approximately 113 feet before it came to rest approximately 59 feet from the roadway. Hornback calculated the vehicle's speed at the time it launched into the air at 68.25 miles per hour.

¶ 7 Hornback also spoke with a manager at Wal-Mart that day and was able to view surveillance tapes. He saw all five males walk into Wal-Mart, he saw the defendant and Fritch in the computer section, and he saw them purchase a can of compressed air.

¶ 8 Hornback testified that he performed an inventory search of the vehicle the day after the crash. He found a can of compressed air on the back floorboard behind the driver's seat. The can's safety tab had been removed, and Hornback did not find the safety tab in the vehicle. His

attention was drawn to the can of compressed air because the surveillance tapes from Wal-Mart showed "that's what they had purchased."

¶ 9 Henry County sheriff's department Detective Jim Kessinger testified that he and Lieutenant Kerry Loncka interviewed the defendant at the hospital on December 12, 2011. The defendant's father, Grant Blakey, was also present. The defendant agreed to allow the recording of the interview. Kessinger stated that the defendant was not in custody, but he was read his *Miranda* rights so he was "aware of what his rights were." Grant signed the form for the defendant, whose hands were sore.[1] Kessinger stated that the defendant told him that the five males had gone to Wal-Mart in his girlfriend's vehicle after leaving Berg's house. The defendant and Fritch walked to the electronics department and purchased a can of compressed air. All that the defendant stated he could remember before he passed out was that they had driven away from Wal-Mart, that he told a joke, and that they were listening to the radio.

¶ 10 Kessinger asked the defendant if he knew what had caused him to pass out. The defendant told him that the doctors said he may have had a seizure, and that they put him on anti-seizure medication. When Kessinger asked if the defendant had suffered from seizures or blackouts before, the defendant told him that he had blacked out the previous day while he was driving a vehicle but stopped at a stop sign. No one was around, and the defendant did not make much of the episode.

¶ 11 Kessinger asked the defendant if he knew what "huffing" was and whether he had ever done it. The defendant initially responded that he did not know what huffing was and that he had never done it before. After Loncka explained what huffing was, Kessinger informed the defendant that Fritch had told him that the defendant had been huffing and that Fritch had witnessed the defendant put the can of compressed air to his mouth in the vehicle before he passed out. The defendant did not respond.

¶ 12 Kessinger then told the defendant he did not think the defendant intended to pass out or hurt the males in the vehicle. Kessinger also told the defendant he thought the defendant had been huffing, and Kessinger asked the defendant if that was what happened. The defendant nodded his head affirmatively and said yes. Kessinger testified that based on his experience, the defendant did not appear to be under the influence of any drugs at the time of the interview.

¶ 13 Loncka testified in accord with Kessinger's testimony regarding the hospital interview of the defendant.

¶ 14 Kessinger also testified that he purchased a nearly identical can of compressed air from the Wal-Mart in Kewanee and he weighed that can and the can found in the vehicle. The new can had its safety tab in place and weighed 455.1 grams, and the can found in the vehicle weighed 430.4 grams. On cross-examination, Kessinger stated that he did not know if some contents of the can found in the vehicle had dispensed during the crash. Kessinger also stated that he did not send the can found in the vehicle to a laboratory to determine if any deoxyribonucleic acid (DNA) or fingerprints could be recovered from the can. On redirect, Kessinger stated that he did not submit the can for fingerprinting because the defendant had told him that they purchased the can from Wal-Mart.

¶ 15 Fritch testified that when he was in Wal-Mart with the other four males, the defendant asked Fritch to hand him a can of compressed air that was on the shelf in front of Fritch. Fritch

---

[1]Loncka testified that the defendant said he was unable to sign the form. Grant Blakey testified that he signed the form because the defendant could not raise his arms.

did so, and the defendant purchased the can of compressed air at the checkout area. When they left Wal-Mart and drove away, Fritch said:

"I was in the process of thinking of a way to convince my mom to let me out of school the next day because we had a half a day, so I was busy on my phone, and a little bit before, Levi had asked me what we were going to do when we got back, and I said I thought we were going over–we were going to go over to one of my friend's house, and he said yeah, that's fine, and we didn't talk after that.

And then we just kept riding. The music was on. It was fine. And then they kept saying his name over and over again, and I wasn't sure what was happening, so I looked back, and they were all–they–all their attentions were focused on him, trying to wake him up. I'm not sure what had happened."

¶ 16    Fritch testified that the three males in the back were screaming the defendant's name and that they said nothing else. The prosecutor then asked Fritch if he remembered giving a statement to a detective from the Henry County sheriff's department at the hospital. Fritch stated that he did not recall the name of the detective, but he did recall giving an interview at the hospital. Fritch said he did not recall what he told the detective the other males had yelled from the backseat. Detective Joe Bedford of the Henry County sheriff's department had interviewed Fritch at the hospital on November 30, 2011, and Fritch was questioned in relation to that interview.

¶ 17    When asked if he was truthful to Bedford, Fritch stated that "at that time and point, he had just seen me after my friends died. I was just trying to get him out of the room." Fritch also said that "not all" of his statements to Bedford were untruthful. After the circuit court admonished Fritch about the fifth amendment and self-incrimination, Fritch stated that he was not paying attention to Bedford such that his answers may not have been accurate.

¶ 18    Fritch testified that the males in the backseat had said the defendant's name "and once or twice was, 'Slow down the car,' 'Wake up,' and that was it." Fritch then denied telling Bedford the following, which came from the transcript of the hospital interview that was introduced into evidence:

"I was looking out the window listening to some music that was playing and then Levi asked me a question so I started talking to him and that's when I turned around and you know looking at the backseat started talking to Levi and I can't remember if it was Brad or Kelsey that said hey Morgan you shouldn't be doing that ***."

After Fritch denied making that statement, the following exchange took place:

"[PROSECUTOR]: Is it that you don't remember or you don't want to say that because you don't want to see Morgan get in trouble, he's your friend?

[FRITCH]: He's my friend."

¶ 19    Fritch then testified that after he had turned to see what the commotion coming from the backseat was about, his attention turned to the defendant. Fritch yelled the defendant's name once and then proceeded to try to gain control of the vehicle. Fritch testified that the defendant was unresponsive, his eyes were closed, and his head was down. Fritch last remembered trying to reach for the brake pedal.

¶ 20    After arguments regarding the admissibility of Fritch's hospital statement to police, the circuit court ruled that the statements made by any of the deceased victims that "Morgan, you shouldn't be doing that" were excited utterances or spontaneous declarations and, therefore,

- 4 -

were exceptions to the rule prohibiting hearsay. Also, the court ruled that the statements were admissible as substantive evidence through Fritch's testimony under section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2010)) because: (1) Fritch's hospital statement was inconsistent with his trial testimony; (2) Fritch was subject to cross-examination; (3) Fritch had personal knowledge of what he described to Bedford; and (4) Fritch's statement was accurately recorded and transcribed.

¶ 21    Gregory Blume, a physician and neurologist, testified that he treated the defendant at the hospital beginning the day after the defendant was admitted. The hospital performed tests to determine what may have caused the defendant to lose consciousness, including an electroencephalogram and magnetic resonance imaging. Blume was unable to definitively prove that the loss of consciousness was caused by a seizure, but he could not absolutely rule out a seizure, either. The defendant was placed on anti-seizure medication as a precaution. Two to three days after the defendant was admitted to the hospital, he relayed to Blume that the day before the crash, at one point during the day at home he found himself sitting in a chair and he could not recall how he got there. He did not tell Blume any story about blacking out in the driver's seat of a vehicle while stopped at a stop sign. Additionally, Blume testified that he did not believe the hospital tested for difluoroethane.

¶ 22    Brittany Blakey testified that she and the defendant were married on July 15, 2012. At the time of the crash, she and the defendant were dating and were living with the defendant's mother. She stated that at the time of the crash, the defendant had never mentioned anything to her about blackouts or seizures.

¶ 23    Dalton Miller testified that he had been the defendant's long-time friend and schoolmate. He stated that on the morning of the crash, while in school, he had talked to the defendant, who told Dalton that he had passed out that morning at a stop sign. Dalton stated that the defendant did not mention anything about passing out or blacking out the day before, either while in the car or at home.

¶ 24    Dylan Miller testified that he and the defendant had been long-time best friends. Dylan stated that the defendant never said anything to him about blackouts or seizures.

¶ 25    Grant Blakey testified that prior to the accident, the defendant never said anything to him about blackouts or losing consciousness. The defendant did tell Grant at some point about blacking out at a stop sign, but Grant could not recall when the defendant told him that.

¶ 26    Grant also testified that he did not see the defendant nod his head or hear him give a verbal affirmative response in relation to the police officers' questions and statements about what Fritch had said and what happened on the day of the accident. He also stated that he did not hear the officers say "huff" or "huffing." In addition, Grant testified that the defendant was on pain medication at the time of the hospital interview, which Grant believed made the defendant sleepy and emotional.

¶ 27    The evidence deposition of Dr. Jerrold Leikin was admitted into evidence. Dr. Leikin, a medical toxicologist, reviewed the defendant's records and came to the conclusion that the defendant's loss of consciousness was "compatible with use of huffing, use of a fluorinated hydrocarbon, such as difluoroethane, which is used in various Dust-Off products; and that the course and the medical nature of that is very consistent and compatible with that as a cause for the traffic accident." Dr. Leikin also testified regarding the medical effects of hydrofluorocarbons, including that they were essentially anesthetics. Hydrofluorocarbons enter the blood stream quickly and can have multiple direct effects on the brain and heart,

including a loss of oxygen to those organs. Once a person inhales a hydrofluorocarbon, loss of consciousness occurs "[w]ithin seconds; less than a minute." Dr. Leikin also stated that the amount of product missing from the can of compressed air found in the vehicle was consistent with one use of that substance for huffing.

¶ 28 With regard to whether the records he reviewed indicated huffing rather than a seizure, Dr. Leikin testified:

> "As far as seizure, there is no mention of generalized what we call tonic clonic or repetitive movement, movements in this sense, as far as a description. There is no mention of neck extension. In fact, there is mention that his neck was flexed. It was slumped over.
>
> With a seizure, you see it just the opposite. You see your neck bent back, not front, overall."

¶ 29 Dr. Leikin stated that the hospital did not test the defendant to determine whether he had any hydrofluorocarbons in his system. Dr. Leikin did not know if this hospital actually had access to such a test; he stated that "virtually every hospital that I know of *** is not able to do this test on site." He stated that the test is not useful for several reasons, one of which is that from a clinical standpoint, a person who becomes acutely intoxicated from hydrofluorcarbons either recovers completely or is dead. In addition, Dr. Leikin testified that while there is no precise data to indicate how quickly hydrofluorcarbons are eliminated from the body, he noted that it is eliminated through the lungs, which means that it can be eliminated very rapidly. Further, a 2006 rodent study indicated that the substance was eliminated within minutes. He opined that the substance would be eliminated from the body certainly within an hour, but most likely well before that.

¶ 30 When asked on cross-examination about seizures and seizure disorders, Dr. Leikin stated that absence seizures–ones in which the individual can have a blank stare on their face but actually lose consciousness–were not likely present in the defendant because they were usually seen in children and would be "very, very rare" in individuals of the defendant's age. Generalized seizures are the ones that typically occur later in life, including around the defendant's age.

¶ 31 Neurologist Dr. Erhan Ergene testified that he treated the defendant when he was admitted to the hospital and subsequent to that time. Dr. Ergene read the list of medications the defendant was on at the hospital, and stated that one of those medications was a narcotic that can cause sleepiness and possibly confusion. He discussed the difference between generalized seizures and partial seizures, with the latter including potential symptoms such as confusion, speech difficulty, and sensory or behavioral changes. He stated that a person can experience both types of seizures simultaneously in that a seizure can start as partial and become generalized. He also stated that seizures tend to appear in children and older people, with uncommon appearances in between those two age groups. He clarified on cross-examination that the former group can include late teenage years or twenties.

¶ 32 Dr. Ergene stated that it was not possible to identify with a reasonable degree of certainty the cause of the defendant's loss of consciousness while driving. He also stated that one's head can go backwards, forwards, or sideways during a seizure. He noted that while the defendant's electroencephalogram was normal, a normal result on that test does not rule out "underlying structural disturbance or diagnosis of seizure disorder." In addition, he stated that he had no training or experience regarding huffing.

- 6 -

¶ 33    The defendant's mother, Cheryl Selburg, testified that in November 2011, the defendant had two issues with severe headaches, which were uncommon for him and which kept him from school twice. She stated that "[t]here were some times also when he–he was there but he wasn't there. You would ask him a question, and it was just a blank stare, and you'd have to say his name loudly and look at him to get his attention and then re-ask the question to get him to answer."

¶ 34    Before closing arguments, the circuit court admitted a page of Fritch's grand jury testimony for the defense's stated purpose of rehabilitating Fritch with a prior consistent statement. Fritch's testimony before the grand jury was that he did not remember telling the police that he heard someone yell, " 'Morgan, you shouldn't be doing that.' " The court also ruled on the motion to suppress the statement the defendant gave to the police while in the hospital. The court found that the defendant was not in custody and made a knowing and intelligent waiver of his rights. Accordingly, the court denied the motion to suppress.

¶ 35    The circuit court announced its decision on June 13, 2013. Among others, the court's findings included that Fritch was not entirely truthful on the stand, as he was trying to protect his friend; that the defendant gave inconsistent statements about when and where he allegedly passed out the day before or the day of the crash; that no one could say with absolute certainty that the defendant did or did not have a seizure; and that the defendant admitted in his statement to police at the hospital that he huffed while driving. The court further found that any small doubt about what transpired in the moments leading up to the crash did not rise to the level of reasonable doubt. Accordingly, the court found the defendant guilty of reckless homicide and aggravated DUI.

¶ 36    The defendant filed a motion for a new trial, alleging, *inter alia*, that the State failed to prove him guilty beyond a reasonable doubt. The motion alleged that the evidence was insufficient to show that the defendant lost consciousness because he inhaled from the can of compressed air. The motion also challenged the admissibility of Fritch's statement that someone in the back of the vehicle said, "Morgan, you shouldn't be doing that."

¶ 37    On September 9, 2013, the circuit court held a sentencing hearing. At the outset of the hearing, the court denied the defendant's motion for a new trial, and the case proceeded to sentencing on the aggravated DUI conviction, as the court vacated the reckless homicide conviction under one act, one crime principles.

¶ 38    With regard to aggravation and mitigation, the prosecutor argued that deterrence was the "one enormous aggravating factor." The prosecutor emphasized that "[b]y sending a clear, consistent message that [DUI] crimes like this will be severely punished, the Court will save lives." The prosecutor acknowledged that mitigating factors existed, but he claimed that there was nothing extraordinary about those mitigating factors. The prosecutor recommended a 20-year prison sentence. Defense counsel discussed several mitigating factors, including: (1) the defendant did not contemplate that his actions would cause serious harm to someone else; (2) the ability to order restitution; (3) the defendant did not have a criminal history; (4) the circumstances were unlikely to recur; (5) the defendant was likely to comply with the terms of probation; (6) excessive medical hardships would result from a prison sentence; (7) excessive hardships would result in relation to the defendant's children; (8) the defendant was likely to be rehabilitated; and (9) the defendant's youth.

¶ 39    After arguments concluded, the court stated that it had considered the facts of the case, the presentence report, the letters submitted on behalf of the defendant, and the factors in

aggravation and mitigation. With regard to mitigation, the court noted that the defendant was young, that he did not have a criminal history, that the circumstances were not likely to recur, and that hardships would result on his family. However, the court noted that the defendant made the choice to inhale from the can of compressed air and did so while behind the wheel with passengers in the vehicle. The court stated that a sentence of probation would deprecate the seriousness of the crime and stated that deterrence was an important aggravating factor in this case. The court then sentenced the defendant to 12 years of imprisonment.

¶ 40       The defendant did not file a motion to reconsider his sentence, but he did file a timely notice of appeal.

¶ 41                                                              ANALYSIS

¶ 42       The defendant's first argument on appeal is that the circuit court erred when it admitted Fritch's out-of-court statement that he heard someone in the backseat yell, "Morgan, you shouldn't be doing that." The defendant contends that it was erroneous to admit the statement for impeachment purposes, as Fritch's testimony was not affirmatively damaging to the State's case, and that it was erroneous to admit the statement as substantive evidence, as Fritch did not have personal knowledge of the event to which the comment from the backseat was referring.

¶ 43       We review a circuit court's ruling on the admissibility of evidence for an abuse of discretion. *People v. Santos*, 211 Ill. 2d 395, 401 (2004). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001).

¶ 44       Initially, we address the State's claim that Fritch admitted on the stand that he made the out-of-court statement to the police. The State claims that Fritch's response of "[h]e's my friend" to the question from the prosecutor, "[i]s it that you don't remember [making the statement to the police in the hospital] or you don't want to say that because you don't want to see Morgan get in trouble, he's your friend?" constituted an admission that he made the out-of-court statement. We disagree with the State. Fritch's answer appears to indicate only that he was trying to protect his friend, rather than an explicit admission that he made the statement to the police while in the hospital. At best, Fritch's answer was ambiguous, and the prosecutor did not ask any follow-up questions to clarify Fritch's response. Under these circumstances, we do not find Fritch's answer to constitute an admission that he made the statement to the police in the hospital.

¶ 45       Next, we address the defendant's claim that the circuit court erred when it admitted Fritch's out-of-court statement as substantive evidence.

¶ 46       In relevant part, section 115-10.1 of the Code of Criminal Procedure of 1963 provides that a prior inconsistent statement is admissible as substantive evidence if: (1) the statement is inconsistent with the witness's testimony at the hearing; (2) the witness is subject to cross-examination regarding the statement; (3) the statement "narrates, describes, or explains an event or condition of which the witness had personal knowledge"; and (4) the statement was proven to have been accurately recorded by, *inter alia*, a tape recorder. 725 ILCS 5/115-10.1 (West 2010); see also *People v. Simpson*, 2015 IL 116512, ¶ 27.

¶ 47 The defendant focuses his argument on the third requirement of section 115-10.1, claiming that the defendant did not have personal knowledge of the event to which the statement from the backseat was referring.

¶ 48 Our review of the record reveals that Fritch's hospital statement did not meet the requirements for admissibility as substantive evidence. In ruling that the statement was admissible as substantive evidence, the circuit court ruled that Fritch had personal knowledge of what he described to Bedford in the hospital. The court also stated that Fritch had personal knowledge of the statement made by one of the backseat passengers. However, there was no testimony presented that Fritch knew of the event to which the comment from the backseat was referring. In fact, Fritch testified that he was busy with his phone and was not paying attention to the defendant. Under these circumstances, the witness did not have personal knowledge of the event to which the comment was referring, and the admission of this statement as substantive evidence was therefore erroneous. See *Simpson*, 2015 IL 116512, ¶ 34; see also *People v. Sangster*, 2014 IL App (1st) 113457, ¶¶ 60-61.

¶ 49 Even if a prior inconsistent statement cannot be admitted as substantive evidence, it may be used for purposes of impeachment if the witness's testimony affirmatively damages the party's case. *Sangster*, 2014 IL App (1st) 113457, ¶ 62; see also Ill. R. Evid. 607 (eff. Jan. 1, 2011). Testimony is affirmatively damaging when the party's case is worse off than it would have been had the witness not testified at all (*Sangster*, 2014 IL App (1st) 113457, ¶ 62), and it must positively aid the defendant's case (*People v. Wilson*, 2012 IL App (1st) 101038, ¶ 44).

¶ 50 In support of its argument that the circuit court properly admitted the statement for impeachment, the State cites to *People v. Leonard*, 391 Ill. App. 3d 926, 933 (2009), for the proposition that a witness's lack of memory regarding a prior statement may be considered damaging. However, we decline to adopt that alleged holding from *Leonard*. First, we are not bound by that decision, as it was decided by a different panel of this court. See *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440 (2008) (holding that "the opinion of one district, division, or panel of the appellate court is not binding on other districts, divisions, or panels"). Second, to the extent that *Leonard* stands for the proposition claimed by the State, *Leonard* was incorrect. Our supreme court has made clear that affirmative damage "does not occur where a party interrogates a witness about a fact which would be favorable to the examiner if true, but then receives a reply which is merely negative in its effect on the examiner's case." *People v. Cruz*, 162 Ill. 2d 314, 360 (1994); see also *Wilson*, 2012 IL App (1st) 101038, ¶ 45 (holding that "a witness's professed lack of memory, standing alone, does not 'affirmatively damage' a party's case for the purpose of impeaching one's own witness" (quoting Michael H. Graham, Graham's Handbook of Illinois Evidence § 607.4 (10th ed. 2010)).

¶ 51 Our review of the record in this case reveals that Fritch's hospital statement was improperly admitted for purposes of impeachment. Pursuant to the above-cited case law, we cannot say that the State's case was affirmatively damaged by Fritch's professed lack of memory with regard to his hospital statement. We are not persuaded by the State's claim that "Fritch's professed lack of recall was damaging because it would allow a trier of fact to believe that Fritch heard passengers yelling, but the passengers had not said anything about defendant doing anything inappropriate." Nor is there anything in the record to indicate that affirmative damage in fact occurred from Fritch's professed lack of memory. Under these circumstances, we hold that the circuit court erred when it admitted the statement for impeachment purposes.

¶ 52    Despite the fact that the admissions of Fritch's hospital statement were erroneous, we find those errors to be harmless. Harmless error occurs when there exists no reasonable probability that the finder of fact would have acquitted the defendant had the error not occurred. *Sangster*, 2014 IL App (1st) 113457, ¶ 68. While the admission of Fritch's hospital statement did in fact help the State's case, the rest of the evidence presented against the defendant was more than sufficient to prove him guilty. The remaining evidence included, *inter alia*, that the defendant went to Wal-Mart minutes before the crash and purchased a can of compressed air. A single can of compressed air was found in the vehicle after the crash. The can's safety tab was missing and an amount of product was missing from the can that was consistent with one use for huffing purposes. The can contained difluoroethane, a chemical that can cause almost instantaneous unconsciousness when inhaled. The defendant lost consciousness while driving moments before the crash. The defendant gave inconsistent stories to multiple people regarding him blacking out and whether it occurred the day of or the day prior to the crash. Most significantly, the defendant admitted to police that he was huffing in the vehicle while driving. Under these circumstances, we hold that the admission of Fritch's statement into evidence was harmless. See *id.* ¶¶ 68-69.

¶ 53    The defendant's second argument on appeal is that his sentence was excessive. The defendant contends that he should have received a lesser sentence due to mitigating factors in his youth, lack of a criminal history, support of family and friends, and the impulsivity of the act leading to the crash.

¶ 54    As charged in this case, aggravated DUI is a Class 2 felony with a sentencing range of 6 to 28 years. 625 ILCS 5/11-501(a)(3), (d)(1)(F), (d)(2)(G) (West 2010). In this case, the defendant received a 12-year prison sentence, which fell within and near the lower end of the statutory range.

¶ 55    We will not disturb a sentence that falls within the statutory limits unless it was an abuse of discretion. *People v. Coleman*, 166 Ill. 2d 247, 258 (1995). "[A] sentence within statutory limits will be deemed excessive and the result of an abuse of discretion by the trial court where the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210 (2000).

¶ 56    Our review of the record reveals that the defendant's sentence was not excessive. In considering an appropriate sentence for the defendant, the circuit court thoroughly discussed the circumstances of the crime and the factors in aggravation and mitigation. The court noted that the defendant was young, that he did not have a criminal history, that the circumstances of the crash were not likely to recur, and that hardships would result on his family from prison time. Nevertheless, the circumstances of the crash were such that deterrence–in terms of deterring others, not the defendant–was a significant factor in aggravation. The court noted that the defendant chose to huff while driving four of his friends. Three of those friends died as a result of the ensuing crash. The defendant's argument on this issue is little more than a request for this court to reweigh the factors considered by the circuit court at the sentencing hearing, which is not the function of a court of review. *Coleman*, 166 Ill. 2d at 262 (holding that it is improper for a reviewing court to reweigh the factors involved in a circuit court's sentencing decision); *People v. Streit*, 142 Ill. 2d 13, 19 (1991) (holding that a reviewing court may not substitute its judgment for that of the sentencing court).

¶ 57    The circumstances of this case are undoubtedly tragic, and there are clearly no winners. The defendant's wife is left to raise their two children, who will spend the majority of their

most formative years without the presence of their father in the home. The parents of the three young men who died as the result of the defendant's heedless and reckless act have lost their sons. Despite the unlikelihood of the defendant repeating this behavior, a sentence signaling that the courts take such cases very seriously may make other young people consider the potentially disastrous consequences before engaging in similar reckless behavior. The defendant faced a sentencing range of 6 to 28 years, and he received a lower mid-range sentence of 12 years. There is nothing in the record to suggest that the court erred when it found that sentence to be appropriate. Under these circumstances, we hold that the circuit court did not abuse its discretion when it sentenced the defendant to 12 years of imprisonment.

¶ 58                                                CONCLUSION

¶ 59         The judgment of the circuit court of Henry County is affirmed.

¶ 60         Affirmed.