2026 IL App (4th) 250352

NO. 4-25-0352

Opinion filed March 31, 2026

Modified upon denial of Rehearing
April 10, 2026

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| KEVON MOON, | ) | No. 21CF358 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | William A. Yoder, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices Vancil and Cavanagh concurred in the judgment and opinion.

**OPINION**

¶ 1        A McLean County jury found defendant, Kevon Moon, guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2020)), attempted first degree murder (720 ILCS 5/8-4, 9-1(a)(1) (West 2020)), and obstructing justice (720 ILCS 5/31-4(a)(1) (West 2020)). The trial court sentenced defendant to a cumulative total of 103 years in prison. Defendant appeals, arguing that (1) his trial counsel was ineffective for failing to object when the State impeached one of its own nonhostile witnesses on direct examination with prior recorded inconsistent statements, (2) the court erroneously allowed the State to introduce into evidence a video showing defendant dancing and rapping while holding a firearm, and (3) the court erroneously allowed one of the lead detectives involved with the case to sit at the State's counsel table throughout trial. We affirm.

¶ 2                              I. BACKGROUND

¶ 3        On the afternoon of October 12, 2020, Jaleel Johnson (Jaleel) and Koebe Harris

were shot outside a residence on Iowa Street in Bloomington, Illinois. Jaleel died from his injuries, but Harris survived. Neither Harris nor the lone eyewitness to the shooting, Azaria Hosea, could identify any suspect.

¶ 4 In March 2021, the State charged Malcolm Johnson (Malcolm), James Moon (James), and defendant with various offenses in connection with the shooting. Authorities never located James. In May 2024, the case proceeded to a jury trial against defendant and Malcolm.

¶ 5 The following general background about the case will help contextualize the issues defendant raises on appeal. Evidence recovered at the scene of the shooting showed there were two guns used. Specifically, four shots were fired from a .40-caliber Glock 27 handgun, which ultimately turned up in Chicago in late November 2020 in the possession of a person who was never charged in connection with this case. Three shots were fired from a weapon, which was never recovered, that used .357-caliber ammunition and left polygonal rifling patterns on bullets when fired.

¶ 6 From reviewing videos and photographs recovered from YouTube and defendant's cellular phones, the police learned that defendant and James had access to a Glock 33 handgun both before and after the shooting. That type of firearm uses .357-caliber ammunition and leaves polygonal rifling patterns on bullets when fired. A few weeks after the shooting, defendant posted on the Internet that he was interested in trading a Glock 33, but police never located that firearm. There was also video evidence showing that defendant and James had access to a .40-caliber handgun two days before the shooting.

¶ 7 The State's overarching theory was as follows. On the early morning of October 10, 2020, Malcolm, who was in the Chicago area, learned that his brother, Terrell Moon (Terrell), was battered in a fight at a house party in Bloomington. Malcolm then traveled to Bloomington,

where he met up at some point with defendant and James. In retaliation for the events of October 10, on October 12, defendant, Malcolm, and James drove around Bloomington in a borrowed Chrysler Pacifica looking for Jaleel and Harris. Eventually, the trio found Jaleel and Harris outside a residence, where two members of the trio shot them. Malcolm sustained a gunshot wound to his back, so the State deduced he was one of the shooters and that either defendant or James also fired bullets at Jaleel and Harris from behind Malcolm. Shortly after the shooting, defendant and James dropped Malcolm off at a local hospital before attempting to wipe down fingerprints from the Pacifica. Defendant then drove to Indiana in a different vehicle. The State alleged that defendant, Malcolm, and James were each accountable for each other's actions in connection with the shooting.

¶ 8        Neither defendant nor Malcolm introduced any evidence at trial. Rather, they both argued that the State's circumstantial evidence was insufficient to prove their guilt beyond a reasonable doubt.

¶ 9        With this general context, we will now focus on the facts relevant to the three issues defendant raises on appeal.

¶ 10        A. Allowing One of the Lead Investigators to Sit at the State's Counsel

Table Throughout Trial

¶ 11        Before trial, the State filed a motion *in limine* requesting permission for Detective Tyrel Klein of the Bloomington Police Department to be present at the State's counsel table throughout trial. The State emphasized that the case involved extensive evidence derived from a lengthy investigation. According to the State, Klein, as one of the lead detectives, had "knowledge and understanding of the witnesses and evidence," and his presence at counsel table would "greatly aid the People in the presentation of its case" without prejudicing defendant.

¶ 12    At the hearing on this motion *in limine*, Malcolm's counsel objected because he expected a "vigorous cross examination of Detective Klein." Malcolm's counsel was concerned that allowing Klein to be present at the State's counsel table throughout trial would (1) give Klein "a built-in appearance of credibility and authority" and (2) allow him to hear other witnesses' testimony. Malcolm's counsel proposed that, if the prosecution required assistance during trial, it would be more appropriate to rely on someone other than a lead detective, such as a paralegal or a different police officer. Defendant's counsel asserted that he agreed with Malcolm's counsel's arguments. The trial court granted the State's motion in light of "the nature of this case" and "the sheer volume of the evidence" involved.

¶ 13    Pursuant to the trial court's ruling, Klein was present at the State's counsel table throughout most of trial, with the exception of the first day, when he was unable to attend. On the third day of trial, Malcolm's counsel asked to exclude Klein from the courtroom while counsel cross-examined another detective. Defendant's counsel did not specifically join in this request, other than to note that he would "reiterate the same argument" he made in connection with the State's motion *in limine*. The court denied Malcolm's counsel's request, reasoning that it "already addressed this issue" and would reaffirm its ruling.

¶ 14    Klein, the State's last witness, testified about the course of the investigation. After the jury found defendant guilty of all charged offenses, he filed a posttrial motion, arguing in part that the trial court erred by allowing Klein to remain at the State's counsel table throughout trial. The court denied the motion, reasoning that defendant was not prejudiced by Klein sitting there, as doing so did not give the jury reason to accord Klein's testimony "added credibility."

¶ 15    B. The Photographs and Videos Connecting Defendant to Firearms

¶ 16    The State also filed a motion *in limine* seeking to admit into evidence some of the

videos and images recovered from YouTube and defendant's cellular phones showing defendant and James possessing firearms. The State maintained that this evidence was admissible pursuant to Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) to prove that defendant, Malcolm, and James had access to weapons of the type that were used in the October 12, 2020, shooting. Both defendant's counsel and Malcolm's counsel objected to this evidence in its entirety as being more prejudicial than probative, emphasizing primarily that the State could not conclusively link any of the weapons that were visible in the videos and pictures to the shooting.

¶ 17        On appeal, defendant focuses on one of the videos that was subject to this motion *in limine*, which was ultimately admitted at trial as People's exhibit L-7 and played for the jury. This 47-second video was created around 5:18 p.m. on October 10, 2020, and showed defendant and James playfully showcasing two handguns while listening to music in a bedroom. During their banter, James said the words, "twin guns, twin Glocks." Both James and defendant then repeated the word "Glock" numerous times before defendant said something about "a lot of head shots." About 30 seconds into the video, the volume of the music that defendant and James were listening to increased. Defendant and James continued to hold their guns for the remainder of the video, sometimes dancing and singing along with a song. The lyrics of that song are difficult to decipher, but the words that can be distinguished do not seem to reference violence or gangs.

¶ 18        Although the trial court barred the State from introducing some of the videos it requested that depicted large amounts of cash alongside the firearms, the court allowed the State to present other exhibits, including People's exhibit L-7, into evidence. The court reasoned that this exhibit was relevant to demonstrate "opportunity, plan, intent, preparation, identity, [and] knowledge." Additionally, in weighing the probative value versus prejudice, the court considered that there was no money depicted in this video, it showed James holding a .40-caliber handgun, it

contained references to twin Glocks, and it would not inflame the jury's passions. Also admitted at trial was a still photograph taken from People's exhibit L-7, which showed the number "40" on one of the firearms as James held it, indicating that it was a .40-caliber weapon.

¶ 19 In his posttrial motion, defendant reiterated his argument that the trial court erred in allowing evidence of any of the videos and photographs depicting firearms. In presenting that motion, defendant did not specifically reference People's exhibit L-7. The court denied that motion.

¶ 20 C. The State's Questioning of Alexander Gayles

¶ 21 One of the ways the State sought to prove a motive for the October 12, 2020, shooting was to have Alexander Gayles testify that he (1) was present when Terrell was battered at a house party on the morning of October 10, 2020, and (2) spoke with Malcolm on the phone about that incident shortly thereafter. The State also wanted to have Gayles testify that he ascertained from surveillance footage taken at the hospital on October 12 that defendant was one of the people who dropped Malcolm off after the shooting. Gayles proved to be an uncooperative witness. He initially did not appear in court pursuant to a subpoena. When he was brought to court, he asserted, outside the presence of the jury, that he intended to invoke his right against self-incrimination. Even though none of Gayles's expected testimony was self-incriminating, the State offered him use immunity, which the court allowed. As an offer of proof, the prosecutor questioned Gayles outside the presence of the jury to ascertain what his testimony would be.

¶ 22 When the State called Gayles to testify before the jury, he answered some preliminary questions, confirming that he was at a party in Bloomington on the morning of October 10, 2020, and that he believed he saw Terrell there. However, Gayles soon contradicted recorded statements he made to the police on October 14, 2020, by testifying that he had not known Terrell

very long. The prosecutor then asked Gayles whether he remembered telling the police during that interview that he and Terrell had known each other for a long time. Gayles responded that he did not remember, as he was "on drugs real bad" when he spoke with the police.

¶ 23    Throughout the rest of the State's direct examination, whenever Gayles professed a lack of recollection or said something that contradicted his prior recorded statements, the State confronted him with the contents of his prior statements and asked him whether he recalled making them. Gayles repeatedly denied recalling speaking with the police. Neither defendant's counsel nor Malcolm's counsel objected during Gayles's direct examination.

¶ 24    Detective Klein subsequently testified that he participated in interviewing Gayles on October 14, 2020, and that People's exhibit No. 74 contained video footage that fairly and accurately depicted portions of the interview. Klein testified that the recording system was functioning throughout the interview. Without objection from either defendant, the trial court admitted this exhibit into evidence and the State played video clips from Gayles's interview, wherein he made statements that were inconsistent with his trial testimony.

¶ 25    Although the State never expressly requested to admit Gayles's prior inconsistent statements as substantive evidence, defendant's appellate counsel acknowledged during oral argument that Gayles's statements were admitted as substantive evidence, rather than merely to impeach him. The record indeed shows that the State relied on Gayles's prior recorded inconsistent statements as substantive evidence when presenting closing arguments. For example, the first sentence of the prosecutor's initial closing argument was: "They were hunted down and they were killed because of a bloody face that Terrell Moon got because he was leaking after that party at 403 North Morris." ("Leaking" was the word Gayles had used to the police when he described seeing Terrell bleeding at the party.) From the context of the prosecutor's remarks, it appears that

- 7 -

the State replayed portions of Gayles's police interview during both the initial closing argument and rebuttal closing argument. Evidently urging the jury to credit the statements that Gayles told the police over his professed lack of recollection of events in his testimony, the prosecutor asserted that Gayles was reluctant to testify against his good friend Malcolm.

¶ 26                                   D. Verdict, Sentencing, and Appeal

¶ 27          The jury found both defendant and Malcolm guilty of all charges. After determining some counts merged, the trial court sentenced defendant to a cumulative total of 103 years in prison for first degree murder, attempted first degree murder, and obstructing justice. Defendant timely appealed.

¶ 28                                          II. ANALYSIS

¶ 29              A. The Admission of Gayles's Prior Inconsistent Statements

¶ 30          Defendant first argues that his trial counsel was ineffective for failing to object to the State impeaching its own nonhostile witness, Gayles, on direct examination. Citing *People v. Wilson*, 2012 IL App (1st) 101038, ¶ 44, *People v. Cruz*, 162 Ill. 2d 314, 358 (1994), and Illinois Rule of Evidence 607 (eff. Jan. 1, 2011), defendant asserts that, "absent a finding that the witness is hostile, the State may only impeach its own witness on direct examination using a prior inconsistent statement if the witness's testimony affirmatively damaged its case." Defendant maintains that Gayles's lack of recollection on the witness stand did not affirmatively damage the State's case, so it was improper for the State to impeach him with prior statements to the police.

¶ 31          Defendant then maintains that his counsel's failure to object to the multiple instances of impeachment prejudiced him. According to defendant, "it is likely that jurors *** disbelieved Gayles's assertions that he was high on drugs and unreliable when he first spoke with police and implicated [defendant]—and this belief, engineered by the State's improper

impeachment, likely contributed to [defendant's] convictions." Although defendant acknowledges that errors in admitting prior inconsistent statements are harmless if such evidence is cumulative of other properly admitted evidence, defendant submits that the State's questioning of Gayles was "more than a simple rehashing of [his] videotaped statements." To that end, defendant mentions that the State impeached Gayles many times and jurors tend to believe things that are repeated.

¶ 32        The State responds that Gayles's prior recorded statements were admitted as substantive evidence under section 115-10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2024)), not merely as impeachment. Although defendant did not challenge in his appellant's brief whether the prosecution laid a proper foundation to admit Gayles's prior inconsistent statements, the State asserts that there was a "defect" in the foundation, insofar as the prosecutor asked Gayles about the content of his prior recorded statements before proving that such statements were accurately recorded. See 725 ILCS 5/115-10.1(c)(2)(C) (West 2024) (providing that one of the requirements to admit a prior recorded inconsistent statement as substantive evidence is for the party offering such evidence to prove the recording was accurate). Nevertheless, the State argues that there was no basis for defense counsel to object to the defect here, given that (1) counsel was aware that Gayles's interview was recorded and (2) the State subsequently proved during Klein's testimony that the interview was recorded accurately. Thus, the State reasons that defendant's ineffective assistance claim fails under the circumstances.

¶ 33        In his reply brief, defendant does not expressly mention the purported foundational defect the State pointed out in its brief. Rather, defendant asserts that section 115-10.1 of the Code "does nothing to change the fact that, absent a finding that a witness is hostile, the prosecution may only impeach its own witness on direct examination using a prior inconsistent statement if

the witness's testimony affirmatively damaged its case." Defendant again cites *Wilson*, *Cruz*, and Rule 607 for that proposition.

¶ 34    To obtain relief based on ineffective assistance of counsel, a defendant must show both that trial counsel performed deficiently and that such deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). With respect to the deficiency requirement, the United States Supreme Court has cautioned that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. A reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and that the challenged action was sound trial strategy. *Strickland*, 466 U.S. at 689. As for *Strickland*'s second requirement, prejudice means "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 35    We begin with defendant's arguments about why his counsel's performance was deficient. Although defendant correctly notes that the trial court never declared Gayles to be a hostile witness, having one's own witness declared hostile is not a prerequisite to impeachment. See Michael H. Graham, Graham's Handbook of Illinois Evidence § 607.4, at 525 (2026 ed.) ("Whether a witness is hostile or unwilling is simply irrelevant in determining whether impeachment by the calling party of the witness with a prior inconsistent statement should be permitted."). To that end, Illinois Supreme Court Rule 238(a) (eff. Apr. 11, 2001) expressly

provides that "[t]he credibility of a witness may be attacked by any party, including the party calling the witness." See Ill. S. Ct. R. 433 (eff. Apr. 1, 1982) (making Rule 238 applicable to criminal cases). Illinois Supreme Court Rule 238(b) (eff. Apr. 11, 2001) then provides that a hostile or unwilling witness may be examined "as if under cross-examination," which would enable the examiner to ask leading questions. In his brief, defendant does not explain how Rule 238(b) is relevant to his argument that the State should not have been allowed to introduce Gayles's prior inconsistent statements. During oral argument in this matter, defendant's appellate counsel likewise did not identify any legal authority supporting defendant's position that a party may not impeach its own witness unless the witness is recognized as hostile. That simply is not the law.

¶ 36        Defendant also insists that a party may not impeach its own witness unless that witness provides affirmatively damaging testimony, which means something more than a professed lack of recollection on the stand. However, that rule applies when a prior inconsistent statement is introduced solely to impeach a witness's credibility, not where the statement is admitted as substantive evidence. See *People v. Sangster*, 2014 IL App (1st) 113457, ¶ 62 ("*If a prior inconsistent statement is not admissible as substantive evidence*, that statement can only be used for impeachment when the testimony of that witness does 'affirmative damage' to the party's case." (Emphasis added.) (quoting *Cruz*, 162 Ill. 2d at 361)); *People v. Hernandez*, 319 Ill. App. 3d 520, 531-32 (2001) (rejecting a defendant's argument that a trial court erroneously admitted prior inconsistent statements in the absence of affirmatively damaging testimony, as the prior inconsistent statements were admissible as substantive evidence); *People v. Woods-Rivas*, 2021 IL App (1st) 192186-U, ¶ 53 (explaining that the requirement for affirmative damage "is only applicable when the prior inconsistent statement is being used for the limited purpose of

impeachment"); Graham, *supra*, at 534 ("Affirmative damage, of course, need not be established when the prior inconsistent statement is admissible as substantive evidence.").

¶ 37     Illinois Rule of Evidence 607 (eff. Jan. 1, 2011) makes this distinction clear:

"The credibility of a witness may be attacked by any party, including the party calling the witness, except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of affirmative damage. *The foregoing exception does not apply to statements admitted pursuant to Rules 801(d)(1)(A), 801(d)(1)(B), 801(d)(2), or 803*." (Emphasis added.)

In turn, Illinois Rule of Evidence 801(d)(1)(A) (eff. Oct. 15, 2015) delineates multiple circumstances where a prior inconsistent statement may be admitted as substantive evidence in a criminal case. Relevant here, Rule 801(d)(1)(A)(2)(c) provides that a statement is not hearsay if (1) the declarant testifies at trial and is subject to cross-examination regarding the statement; (2) the statement is inconsistent with the declarant's trial testimony; (3) the statement narrates, describes, or explains a matter within the personal knowledge of the declarant; and (4) the statement is proved to have been accurately recorded on a tape recorder, videotape, or other similar electronic means of sound recording. Ill. R. Evid. 801(d)(1)(A)(2)(c) (eff. Oct. 15, 2015). Section 115-10.1 of the Code contains the same rule. See 725 ILCS 5/115-10.1 (West 2024).

¶ 38     In presenting his argument about the requirement for affirmative damage, defendant cites cases where witnesses' prior inconsistent statements, or portions thereof, did not meet the requirements to be admitted as substantive evidence. See *Cruz*, 162 Ill. 2d at 355 (a witness's prior inconsistent statements were unrecorded and were not made under oath, and the witness did not acknowledge on the stand having made those statements, so they could not be

- 12 -

admitted as substantive evidence by having other witnesses testify about what the declarant told them); *People v. Guerrero*, 2021 IL App (2d) 190364, ¶ 70 (same); *Wilson*, 2012 IL App (1st) 101038, ¶ 42 (portions of a witness's prior inconsistent written and audiotaped statements were inadmissible as substantive evidence because that witness lacked personal knowledge of the matters asserted in the out-of-court statements); *People v. McCarter*, 385 Ill. App. 3d 919, 931 (2008) (same). Thus, a discussion of affirmative damage was relevant in the cases defendant cites because the issue facing the reviewing courts was whether the party calling a witness could introduce that witness's prior inconsistent statement solely for impeachment purposes.

¶ 39        Here, by contrast, defendant does not argue that the State failed to satisfy any of the requirements outlined in Rule 801(d)(1)(A)(2)(c) and section 115-10.1 of the Code to justify admitting extrinsic evidence of Gayles's prior inconsistent statements as substantive evidence (*i.e.*, the recorded statements themselves). Nor does he dispute that the statements at issue were indeed admitted as substantive evidence and used accordingly by the prosecution during closing arguments. Notably, for purposes of admitting a prior statement substantively, a "witness's prior statement need not directly contradict his or her trial testimony to be considered inconsistent," and it will suffice if the witness provides evasive answers or claims an inability to recall events that he or she previously addressed outside of court. *Guerrero*, 2021 IL App (2d) 190364, ¶ 50. The record here shows that Gayles was exactly the type of turncoat witness that Rule 801(d)(1)(A) and section 115-10.1 of the Code were intended to address. See *Guerrero*, 2021 IL App (2d) 190364, ¶ 48 (noting that the rule allowing the use of prior inconsistent statements as substantive evidence was designed to address situations where turncoat witnesses "disavow or disown their former statements made under circumstances indicating the statements were likely true").

¶ 40    Rather than focusing on the requirements outlined in the rules of evidence and the Code to admit a prior inconsistent statement substantively, defendant emphasizes in his opening and reply briefs that Gayles was never recognized as hostile and his professed lack of recollection did not affirmatively damage the State's case so as to justify impeachment. But, as explained, a declaration of hostility is unnecessary to impeach one's own witness and affirmative damage is not a requirement when prior inconsistent statements are admitted as substantive evidence, which is what the record shows happened here. Had defendant's trial counsel objected to the State's direct examination of Gayles on the bases that he was not declared a hostile witness and did not affirmatively damage the State's case, such objections would have been deemed meritless, as Gayles's statements were admissible as substantive evidence. Accordingly, defendant cannot establish the deficient performance requirement to maintain an ineffective assistance claim. See *Sangster*, 2014 IL App (1st) 113457, ¶ 81 (noting that an attorney is not ineffective for failing to make an objection that would be futile).

¶ 41    In rebuttal during oral argument in this matter, defendant's appellate counsel argued for the first time that the State failed to prove that Gayles's prior inconsistent statements were recorded accurately before confronting him with the content of those statements on direct examination. As mentioned above, this line of reasoning echoed the State's position in its appellee's brief that there was some sort of defect in the foundation until the prosecution completed the foundation during Klein's testimony. Defendant later filed a petition for rehearing, criticizing our failure to address this issue in the original opinion we filed.

¶ 42    Defendant forfeited his right to challenge the procedure and foundation for admitting Gayles's prior inconsistent statements as substantive evidence, as defendant did not raise this point as a basis to challenge the judgment until oral argument. See Ill. S. Ct. R. 341(h)(7) (eff.

- 14 -

Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). Moreover, neither defendant nor the State have cited any authority indicating that the prosecution must prove the accuracy of the recording before confronting a witness with the content of his or her prior recorded inconsistent statements.

¶ 43    Forfeiture aside, the record does not support a claim of ineffective assistance based on defense counsel's failure to object to lack of foundation when the State confronted Gayles with the content of his prior recorded inconsistent statements before proving the recording was accurate. Part of defendant's burden in connection with an ineffective assistance claim of this nature would be to show a reasonable probability that (1) had defense counsel objected to the lack of foundation, the State would have been unable to correct any defect, (2) the trial court would have refused to admit Gayles's prior inconsistent statements as substantive evidence, and (3) defendant would have been acquitted. See *People v. Aquisto*, 2022 IL App (4th) 200081, ¶ 64 (articulating similar requirements in a case where the defendant argued his counsel was ineffective for failing to object to the lack of a proper chain of custody for narcotics evidence). Here, the State indeed laid a complete foundation to admit Gayles's prior inconsistent statements, as it subsequently proved through Klein that the subject recording was accurate, had the recording admitted into evidence, and played the recording for the jury. Accordingly, defendant has not shown he received ineffective assistance of counsel for failure to raise an objection to foundation.

¶ 44    More fundamentally, there was no foundational defect here. The parties overlook that confronting Gayles with the content of his prior inconsistent statements was the first foundational step to admitting extrinsic evidence of those statements as substantive evidence. See *People v. Grayson*, 321 Ill. App. 3d 397, 405-06 (2001) (explaining how to lay the foundation for introducing prior inconsistent statements); Ill. R. Evid. 613(b) (eff. Sept. 17, 2019) (providing that

- 15 -

"[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is first afforded an opportunity to explain or deny the same and the opposing party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require"). Indeed, it would have been improper for the prosecution to play any portion of Gayles's recorded interview for the jury before giving Gayles the opportunity to explain on the witness stand whether he previously made statements that were inconsistent with his testimony. Defense counsel then conducted a very brief cross-examination. Once Gayles told the jury he did not remember making numerous statements that were inconsistent with his testimony, the State then had to admit the recording as extrinsic evidence to prove Gayles indeed made those statements. Doing so required the State to lay a proper foundation for the recording by having a witness with knowledge of Gayles's police interview, such as Klein, testify that the recording was accurate. See *Grayson*, 321 Ill. App. 3d at 406 (explaining that if a witness denies making a prior recorded inconsistent statement, the State must "complete the impeachment (and, concomitantly, the foundation for the statement's admissibility as a prior inconsistent statement under section 115-10.1 of the Code) by presenting extrinsic evidence that [the witness] did, in fact, make that statement"). Thus, the State's manner of proceeding here was entirely proper. Contrary to what the parties seem to assume, the State is not required to prove preemptively that each police interview was accurately recorded, just in case some witness happens to contradict his or her prior recorded statements and then claims not to remember the interview.

¶ 45        Of course, if defense counsel had reason to suspect the State could not complete the foundation to admit extrinsic evidence of Gayles's prior recorded inconsistent statements, then it would have been appropriate for counsel to raise that issue before the State confronted Gayles with the content of his prior statements in front of the jury. However, it seems obvious from the

- 16 -

record that the reason neither defendant's counsel nor Malcolm's counsel objected during Gayles's direct examination was because (1) everyone understood from the offer of proof preceding his testimony that he would claim a lack of recollection on the stand and (2) there was no real question that his police interview was recorded accurately. Under these circumstances, the record does not show that defense counsel performed deficiently by failing to raise an objection to foundation during Gayles's direct examination.

¶ 46    We also note that defendant presents an unpersuasive argument about why he was prejudiced by the State's direct examination of Gayles in connection with any of the specific points defendant raises. As part of his overarching argument about prejudice, defendant quotes a case involving the use of prior *consistent* statements for the proposition that "[p]eople tend to believe that which is repeated most often, regardless of its intrinsic merit, and repetition lends credibility to testimony that it might not otherwise deserve." *People v. Smith*, 139 Ill. App. 3d 21, 33 (1985). That principle has no application here, as the State was entitled to introduce Gayles's multiple prior inconsistent statements as substantive evidence and doing so required the State to lay the foundation by confronting him with each statement.

¶ 47    Moreover, in presenting his argument about prejudice for purposes of *Strickland*, defendant does not address the strength of the State's other evidence. Notably, in addition to Gayles's testimony, the State's other evidence establishing a motive for the shooting included (1) surveillance footage captured from inside the residence where Terrell was battered on October 10, 2020, (2) phone records confirming that there was a call between Gayles's phone and Malcolm's phone after that battery, (3) phone records indicating that somebody used Malcolm's phone to communicate with a phone belonging to Terrell's girlfriend after the battery, and (4) historical-cell-site-analysis evidence showing that Malcolm traveled from the Chicago area to

Bloomington hours after the battery. Additionally, Gayles was not the only witness who identified defendant as one of the people who dropped Malcolm off at the hospital after the shooting in a Chrysler Pacifica. Indeed, defendant's fingerprint was found on a bottle inside that vehicle. It is defendant's burden to show how he was prejudiced by any error attendant to his counsel's failure to object to the State relying on Gayles's prior inconsistent statements. Defendant makes no meaningful attempt to place the purported error within the broader context of the trial evidence.

¶ 48       For these reasons, defendant has not met his burden to show either deficient performance or prejudice to sustain an ineffective assistance claim.

¶ 49                    B. Admission of People's Exhibit L-7

¶ 50       Defendant next argues that the trial court erred by allowing the State to play People's exhibit L-7 for the jury. According to defendant, this video was more prejudicial than probative, as the State could have proved defendant's access to a firearm simply by presenting still images taken from that video. A major theme in defendant's argument is that jurors may harbor an implicit bias against rap music, associating that genre of music with violence and gangs. In support of that proposition, defendant relies on journal articles, which were not cited or presented to the court below, and a case decided by the Supreme Court of New Jersey, *State v. Skinner*, 95 A.3d 236 (N.J. 2014). According to defendant, People's exhibit L-7 "served no function other than to play on jurors' preconceived notions about rap music and gang violence, and to therefore encourage them to decide the case based on prejudice, negative emotions, and hostility."

¶ 51       The State responds that the trial court acted within its discretion by admitting two different videos into evidence, one of which is People's exhibit L-7. The State maintains that, if the jury had only been shown either still images taken from People's exhibit L-7 or a version of that video with the audio silenced, the jury would have missed relevant statements that defendant

and James made. Objecting to defendant's reliance on journal articles, the State notes that this court has "repeatedly and emphatically refused to consider evidence and arguments derived from secondary sources that were not presented to the trial court." The State also maintains that we need not rely on *Skinner*, as there are Illinois cases addressing the admission into evidence of rap music in criminal trials.

¶ 52    In his reply brief, defendant confirms that the only exhibit he is challenging is People's exhibit L-7. Defendant directs our attention to numerous instances where Illinois reviewing courts have cited scientific writings and studies in their opinions.

¶ 53    Except as otherwise provided by law, all evidence that is relevant is admissible. Ill. R. Evid. 402 (eff. Jan. 1, 2011). To be relevant, evidence must have some "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). A court may exclude relevant evidence for various reasons, including that "its probative value is substantially outweighed by the danger of unfair prejudice." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 54    Generally, the State is prohibited from presenting evidence that a defendant committed other crimes or bad acts to show that the defendant had a propensity to commit such acts. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Here, however, the trial court admitted People's exhibit L-7 pursuant to the rule allowing such evidence to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). We review a ruling on a motion *in limine* directed to the admission of evidence for an abuse of discretion. *People v. Bush*, 2023 IL 128747, ¶ 57. A court abuses its direction only if its " 'decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it.' " *Bush*, 2023 IL 128747, ¶ 57 (quoting *People v. Rivera*, 2013 IL 112467, ¶ 37).

¶ 55　　　　We note that defendant presents his challenge to People's exhibit L-7 as a preserved issue, even though he did not request the trial court to redact the audio in that exhibit or to have still frames admitted in lieu of playing the video. Nor did defendant argue below that the specific music that is audible in People's exhibit L-7 made that exhibit unduly prejudicial. Rather, at the trial level, both defendant and James presented a much broader objection to all of the videos and photographs the State sought to introduce pursuant to its motion *in limine*, arguing primarily that the firearms depicted in the proposed exhibits could not conclusively be linked to the shooting that occurred on October 12, 2020. Nevertheless, the State does not argue that defendant has forfeited the basis for his appellate objection to People's exhibit L-7, so the State has in turn forfeited any argument it could have made on that point. See *Bush*, 2023 IL 128747, ¶ 56 (determining that the State forfeited any potential argument that the defendant's argument was forfeited).

¶ 56　　　　However, the State objects to defendant relying on journal articles that address the public's perception of violent lyrics in rap music. As the State notes, it is indeed improper for a party to use secondary sources to establish new facts on appeal, especially in support of a challenge to a ruling that is reviewed deferentially. See *People v. Cline*, 2022 IL 126383, ¶ 32 (explaining that a review of the sufficiency of the evidence "must be limited to evidence actually admitted at trial"); *People v. Wiley*, 2025 IL App (4th) 240186-U, ¶ 45 (refusing to consider secondary sources that a defendant provided for the first time on appeal to establish facts regarding the nature of abusive head trauma as part of a challenge to the sufficiency of the evidence); *People v. Klein*, 2022 IL App (4th) 200599, ¶¶ 47-52 (refusing to consider a secondary source that a defendant provided for the first time on appeal in support of an excessive-sentencing challenge). Here, defendant relies on journal articles that were not presented below to establish a factual premise not argued below—that jurors inherently view rap music negatively. Defendant then uses that factual

premise to challenge the court's decision to allow People's exhibit L-7 into evidence. In the absence of a developed factual record and relevant findings to review, it would be inappropriate for us to make broad assumptions about how jurors generally perceive rap music. Accordingly, we will not consider the journal articles that defendant relies on in presenting his challenge to the admission of the evidence.

¶ 57    We hold that the trial court acted within its discretion by allowing People's exhibit L-7 into evidence. This video was relevant because (1) it was filmed two days before Jaleel and Harris were shot with the use of two different firearms, one of which was determined to be a .40-caliber handgun manufactured by Glock; (2) this video depicted James and defendant showcasing two handguns, one of which was discernable as being a .40-caliber weapon; and (3) James and defendant repeatedly said the word "Glock" on the video and made comments about "twin guns, twin Glocks" and "a lot of head shots." Defendant argues for the first time on appeal that the video's audio should have been silenced when played for the jury or that the State should have been limited to showing the jury still images taken from the video. However, the audio was important to inform the jury of the comments that James and defendant made.

¶ 58    On appeal, defendant objects to the fact that this video showed him and James dancing and singing along to rap music. We discern no obvious prejudice from the dancing and singing itself. The lyrics in the song are difficult to decipher on the video, and defendant does not even attempt to tell us what was being said in the song. Having reviewed the video numerous times, we were unable to ascertain any objectionable lyrics. At oral argument, defendant's appellate counsel clarified that defendant's objection to the video is not based on the lyrics of the specific song.

¶ 59      The parties cite two cases where reviewing courts considered whether the State could use the content of rap lyrics that the defendants composed as evidence that the defendants committed the crimes for which they were being tried. See *People v. Colone*, 2024 IL App (1st) 230520, ¶ 57; *Skinner*, 95 A.3d at 241. In a third case mentioned in the briefs, *Bush*, our supreme court held that a trial court should have allowed the defense to impeach a witness with prior inconsistent statements that he made in a rap video, wherein he narrated the events at issue in the defendant's trial. *Bush*, 2023 IL 128747, ¶ 65. The present case is distinguishable from *Bush*, *Colone*, and *Skinner*, as the State never attempted to use the content of any song lyrics against defendant. Rather, the music here was ancillary to other events and comments on the video that were unquestionably relevant. And again, defendant does not argue that the music that he and James sang along with on the video had violent lyrics. Thus, defendant's concerns about jurors being biased against violent rap songs are misplaced.

¶ 60      The trial court properly allowed State's exhibit L-7 into evidence. Although the video was damaging to the defense precisely because it was so relevant, persuasively showing that defendant had access to weapons of the type that were used in a shooting two days later, the court was justified in believing that the probative value of the evidence was not substantially outweighed by concerns of prejudicing defendant unfairly.

¶ 61                    C. Klein's Presence at Counsel Table Throughout Trial

¶ 62      As his final issue, defendant argues that the trial court erred in allowing Klein to sit at the State's counsel table throughout trial. Defendant maintains that, although the State alleged that Klein's presence would " 'greatly aid the People in the presentation of its case,' " the State never expressly represented that Klein's presence was " 'essential,' " which is a word used in Illinois Rule of Evidence 615 (eff. Jan. 1, 2011). Additionally, according to defendant, Klein's

presence in court throughout trial was not essential, as the evidence was not "highly complicated or technical" and the record does not contain any "affirmative indication" that Klein actually aided the prosecution. According to defendant, the court's decision to allow Klein to remain at counsel table throughout trial "bolstered [Klein's] credibility, potentially influenced other [witnesses'] testimony, and gave Klein the opportunity to tailor his testimony based on any perceived gaps in the State's evidence." Defendant also reasons that, because the evidence against him was circumstantial, "it is plausible that Klein's seat at the State's counsel table was the tipping point that led the jury to convict [defendant]."

¶ 63        Defendant acknowledges that Illinois reviewing courts, in unpublished dispositions, "have previously held that a testifying officer's presence at the State's counsel table is not typically unduly prejudicial to defendants." However, defendant asks us to embrace the rationale espoused by the Supreme Court of Kansas in *State v. Sampson*, 301 P.3d 276 (Kan. 2013), which held that testifying officers may not sit at the State's counsel table throughout trial.

¶ 64        In response, the State observes that this court rejected similar arguments in a published decision, *People v. Chatman*, 2022 IL App (4th) 210716, *aff'd on other grounds*, 2024 IL 129133. Moreover, in the State's view, defendant has failed to identify any prejudice specific to the circumstances of this case.

¶ 65        If a party asks for anticipated witnesses to be excluded from hearing other witnesses' testimony, a trial court ordinarily should grant that request. See *People v. Dixon*, 23 Ill. 2d 136, 140 (1961) (holding that a trial court erroneously refused to exclude *any* witnesses from the courtroom without articulating a "sound basis" for denying the defendant's motion to exclude witnesses). Nevertheless, our supreme court has long recognized that, even if there is a general exclusion order entered, trial courts have discretion to allow specific witnesses to remain in the

courtroom and to sit at the State's counsel table during trial. *People v. Reed*, 333 Ill. 397, 416 (1928).

¶ 66 In 2011, Illinois codified its rules of evidence. Rule 615 provides:

"At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause, or (4) a person authorized by law to be present." Ill. R. Evid. 615 (eff. Jan. 1, 2011).

¶ 67 In 2022, this court decided *Chatman*, which involved a defendant in a murder case who argued that a trial court erroneously allowed the lead investigator "to sit at counsel's table and to remain in the courtroom throughout the jury trial." *Chatman*, 2022 IL App (4th) 210716, ¶ 66. Rejecting the defendant's argument, we explained that, although some jurisdictions allow parties to exclude witnesses from the courtroom as a matter of right, Illinois leaves that matter to the trial court's discretion. *Chatman*, 2022 IL App (4th) 210716, ¶¶ 67-68. Compiling Illinois Supreme Court cases decided between 1957 and 1977, we discerned that "[i]t is well settled under Illinois law that a testifying police officer may be present at trial during other witnesses' testimony and sit at the prosecutor's table with counsel." *Chatman*, 2022 IL App (4th) 210716, ¶ 69. Additionally, we explained that investigative agents may be designated as State's representatives pursuant to the second exception outlined in Rule 615, thus allowing such witnesses to be present in court throughout trial. *Chatman*, 2022 IL App (4th) 210716, ¶ 70.

¶ 68　　　　Here, defendant presents essentially the same argument that we rejected in *Chatman*. He directs our attention to no Illinois authority disagreeing with *Chatman* but instead relies on the reasoning of a case from Kansas predating *Chatman* by nine years. Moreover, we expressly recognized in *Chatman* that some jurisdictions have taken approaches that differ from Illinois's position. *Chatman*, 2022 IL App (4th) 210716, ¶ 67. Defendant has given us no reason to depart from the holding of *Chatman*, which was decided fairly recently. Principles of *stare decisis* militate against reconsidering *Chatman*'s reasoning and holding.

¶ 69　　　　Defendant mentions that the State never expressly alleged in its motion *in limine* that Klein's presence throughout trial was "essential" to assist the prosecution, which is the word used in the third exception outlined in Rule 615. Although this argument could be deemed to quibble with semantics, even in the absence of it being essential, the second exception in Rule 615 allows the State to designate a law enforcement officer as its representative for purposes of trial. *Chatman*, 2022 IL App (4th) 210716, ¶ 70. Thus, had defendant argued below that the State did not expressly allege that Klein's presence in the courtroom was essential for purposes of the third exception, the State could have simply designated Klein as its representative for purposes of the second exception.

¶ 70　　　　Finally, we note that defendant has not presented a convincing argument that he was prejudiced by Klein's presence at the State's counsel table. Defendant asserts generally that the trial court's decision "bolstered [Klein's] credibility, potentially influenced other [witnesses'] testimony, and gave Klein the opportunity to tailor his testimony based on any perceived gaps in the State's evidence." However, defendant does not attempt to link those broad claims to the specific circumstances, such as by explaining (1) why a reasonable jury might have deemed Klein's testimony untrustworthy had he not been sitting at counsel table throughout trial, (2) which

witnesses Klein potentially influenced and how, and (3) what gaps existed in the State's evidence that Klein addressed in his testimony.

¶ 71 Under the circumstances, we hold that the trial court acted within its discretion by allowing Klein to remain in the courtroom throughout trial and sit at the State's counsel table.

¶ 72 III. CONCLUSION

¶ 73 For the reasons stated, we affirm the trial court's judgment.

¶ 74 Affirmed.

*People v. Moon*, 2026 IL App (4th) 250352

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of McLean County, No. 21-CF-358; the Hon. William A. Yoder, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Hayley D. Yussman, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Erika Reynolds, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and Alan Kennedy, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |